PLOW REALTY COMPANY OF TEXAS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1382. Promulgated January 23, 1945.

*Haysler A. Poague, Esq.*, for the petitioner.
*Gene W. Reardon, Esq.*, for the respondent.

OPINION.

ARNOLD, *Judge*: For the taxable year 1940 respondent determined an income tax deficiency of $3,144, a personal holding company surtax deficiency of $10,997.67, and a 25 percent penalty of $2,749.42 for failure to make and file a timely personal holding company surtax return. The issues are (1) whether petitioner is a personal holding company; (2) whether petitioner is subject to the 25 percent penalty provided by section 291 of the Internal Revenue Code; (3) whether certain properties sold by petitioner had no basis for computing gain; and (4) whether petitioner is entitled to a loss deduction on 31 acres of land resulting from disclosure of defective title thereto.

All facts deemed material to the issues have been stipulated or admitted. We adopt the stipulated facts as our findings of fact and the pertinent portions thereof are hereinafter set forth.

The petitioner is a corporation organized under the laws of Texas. Its 1940 income and declared value excess profits tax return, on Form 1120, was filed with the collector of internal revenue for the second district of Texas at Dallas.

The petitioner was incorporated March 15, 1938, under the laws of Texas. Its incorporation resulted from a reorganization of Plow Realty Co. of Missouri. The reorganization merely effected its incorporation in another state, a change in corporate name, and a refund of $7,500 to the stockholders. The stockholders of the dissolved Missouri corporation held identical stock interests in the newly organized Texas corporation. Petitioner, after said reorganization, had an authorized capitalization of $42,500, divided into 425 shares of $100 par value stock, which represented an actual cash investment of that amount. During the last half of the year 1940 more than 50 percent in value of its outstanding stock was owned by five individuals, the word "individuals" being as defined by the revenue act.

The Plow Realty Co. was originally incorporated in Missouri on September 9, 1908, under the name Foster-Curl Real Estate Co., with a paid-in capital of $50,000. The name was changed to the Plow Realty Co. on December 1, 1908. The original stockholders were M. S. Curl and Clara S. Curl, his wife, and S. S. Foster, Geo. S. Foster, and Wm. C. Foster, brothers of Mrs. Curl. All are now deceased and the stock is owned by their children and heirs.

On April 9, 1906, G. A. Foote conveyed to one Rhodes et al. approximately 6,407 acres of land situated in the counties of Colorado and Lavaca of the State of Texas for a stated consideration of $32,035. In that sale Foote reserved one-fourth of the mineral and oil rights in the land. On September 28, 1908, Rhodes et al. sold said land as containing 6,567 acres to Curl, acting on behalf of the Plow Realty Co., for the sum of $38,442 and excepted from the deed one-fourth of the mineral interest in the oil and other minerals theretofore reserved by Foote. Thereafter Curl transferred the land to his principal, the Plow Realty Co. of Missouri, which corporation had been formed for the purpose of taking the title to the land. In September 1911 Curl, for and on behalf of the Plow Realty Co. of Missouri, purchased from Foote the one-fourth of the oil and minerals which had theretofore been reserved by him. The consideration named in the deed was $1. The corporate records do not disclose what actual consideration Curl paid for the one-fourth mineral interest.

The said lands are not usable for agricultural purposes, but are usable and are used for grazing cattle. The only income therefrom, except that from mineral exploration by the Shell Oil Co. under its lease hereinafter mentioned, has been from grazing, rental, and hunting rights, which income has never been substantial.

In the year 1914 the Plow Realty Co. entered into negotiations with E. L. Street of Kansas City, Missouri, now deceased, for the mineral development of said land, and on July 14, 1914, the state geologist of the State of Kansas, Erasmus Haworth, made a geological survey of the land in connection therewith. The report recommended "careful and relatively extended prospecting by deep drilling."

Thereafter, beginning in 1927 and prior to the lease given to the Shell Oil Co. hereinafter stipulated, several leases were made to various oil companies and individuals on said land or parcels thereof for exploration and development of oil and minerals, but the leases had all been released or expired previous to the last lease given to the Shell Oil Co. by the Plow Realty Co. on the 29th day of July 1939.

On July 29, 1939, the petitioner granted an oil, gas, and mineral lease on approximately 5,465 acres to the Shell Oil Co. of Houston, Texas. The pertinent provisions of the lease and summaries of other portions thereof are as follows:

\* \* \* \* \* \* \*

1. Lessor, in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration in hand paid, and additional rentals as hereinafter set out, and of the royalties herein provided, and of the agreement of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipelines, building tanks, power stations, telephone lines and other structures thereon, to produce, save, take care of,

treat, transport and own said products, and housing its employees, the following described land in Colorado and Lavaca Counties, Texas, * * *

\* \* \* \* \* \* \*

For the purpose of calculating the payments hereinafter provided for, said land is estimated to comprise 5,465.08 acres whether it actually comprises more or less, and being all of the land owned by Lessor in above described surveys.

2. Subject to the other provisions herein contained, this lease shall be for a term of five years from this date (called "primary term") and upon subdivided tracts or units as long thereafter as oil, gas, or other mineral is produced from any particular designated subdivided tract or tracts upon which said production at the end of said five year period is in existence, or upon which operations are then being conducted as hereinafter provided, and as said tract or tracts have been identified and designated as hereinafter set out.

3. The royalties to be paid by Lessee are (a) on oil one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; where gas from a well producing gas only is not sold or used, Lessee may pay as royalty $100.00 per well per year and if such payment is made, it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; and (c) on all other minerals mined and marketed, one-tenth either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be fifty cents (50¢) per long ton. Lessee shall have free use of oil, gas, coal, wood, and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used. Lessor shall have the privilege at his risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling thereon out of any surplus gas not needed for operations hereunder.

\* \* \* \* \* \* \*

The lease automatically terminated unless the lessee, on or before the anniversary date of the lease, paid the lessor rental of $5,465.08, less $1 per acre for the area of such tract or tracts upon which operations should have been commenced. In like manner and upon like payments or tenders annually the commencement of drilling operations could be further deferred for successive 12-month periods during the primary term. The leased acreage was divided into 8 tracts of 640 acres each and a ninth tract of 345.08 acres, and it was agreed that the commencement of drilling operations on any tract or tracts did not obviate rental payments as to the other tracts. The lessee had no right to release or surrender the lease as to a portion of the premises until it had first completed a well which tested the horizons known to exist in the area or reached a depth of 5,250 feet, but the lessee could at any time release and surrender the entire lease. Upon the sur-

render of any acreage the rental payable under the lease was to be reduced proportionately. The lessee agreed to drill offset wells and was given the right to remove all property and fixtures, providing all rentals due and accrued were fully paid. The rights of either lessor or lessee could be assigned in whole or in part, the lease provisions extending to their heirs, successors, and assigns, but no change or division in ownership of the land, rentals, or royalties was to enlarge the obligations or diminish the rights of the lessee. No sale or assignment by the lessor would be binding on the lessee until the latter was furnished by registered mail a certified copy of recorded instrument evidencing the same. If the lessee assigned a portion or portions of the lease the rental payments were to be apportioned according to the surface area of the leasehold owners and default by one was not to affect the rights of others. If 6 or more parties became entitled to royalty, the lessee could withhold payment until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all. The breach by lessee of any obligation would not work a forfeiture or termination of the lease, nor cause a termination or reversion of the estate created, nor be grounds for cancellation of the lease in whole or in part.

Under dates of May 11 and May 14, 1940, petitioner executed "mineral deeds" to B. L. Ryan and Lake Shore Corporation, respectively, and received in consideration therefor $60,001. The deeds, which are alike in all material respects, state that petitioner "does hereby grant, bargain, sell and convey unto the said GRANTEE an undivided one-eighth (⅛) interest in and to all of the oil, gas, sulphur and other minerals, whether similar or dissimilar, in, on and under the following described land [description is the same as land described in Shell lease, *supra*]." Other provisions of the deeds read as follows:

It is distinctly understood and herein stipulated that said land is under an oil and gas lease made by GRANTOR to the SHELL OIL COMPANY, Incorporated providing for a royalty of one-eighth (⅛) of the oil and certain royalties or rentals for gas and other minerals and the GRANTEE herein shall receive one-eighth (⅛) of the royalties provided for in said lease; but he shall have no part of the annual rentals paid to keep said lease in force.

This grant shall run and the rights, titles and privileges hereby granted shall extend to GRANTEE herein, his heirs, administrators, successors and assigns for a period of twenty years from the date hereof upon all of the tract of land hereinabove described * * *, and shall further extend as long thereafter * * * as oil, gas or other minerals, or either of them, is produced or mined from any one or more specifically designated tract or tracts as set out in the plat next hereinabove described in paying or commercial quantities. If at the expiration of twenty years from the date hereof oil, gas or other minerals or either of them, is not being produced or mined from each of the said above designated tract or tracts in paying or commercial quantities, each of said designated tracts to be treated severally, this contract shall be null and void

and GRANTEE's rights hereunder shall terminate as to such tract or tracts upon which no oil, gas or other minerals or either of them is being so produced or mined.

It is further agreed that GRANTEE shall have no interest in any bonus money or rentals received by GRANTOR in any future lease or leases given on said land or any part thereof, and it is further understood and agreed that the GRANTEE does not by these presents acquire any right to participate in the making of future oil, gas or other mineral leases upon said land or any portion thereof or participate in the making of said future leases in event the present leases or any portion thereof shall become cancelled or forfeited, or of participating in any rental to be paid for the privilege of deferring the commencement of a well under any lease, now or hereafter upon all or any portion of the land described hereinabove. It shall not be necessary for the GRANTEE to join in any such lease or leases so made; that GRANTEE shall receive under such lease or leases one-sixty fourth ($\frac{1}{64}$) part of all oil, gas and other minerals taken and saved under any such lease or leases except sulphur, on which GRANTEE shall receive 6.25¢ per long ton, and he shall receive the same out of the royalty provided for in such lease or leases.

To have and to hold the same unto the GRANTEE, his heirs, administrators, successors and assigns upon the terms and conditions hereinabove specified.
* * *

On the respective dates of said deeds no oil, gas, or other minerals were being taken from the land and none had been discovered. On May 25, 1940, Shell Oil Co. completed a producing well on unit 4 under its aforesaid lease.

The petitioner in its 1940 income tax return allocated a cost basis of $10,000 to the two one-eighth interests which it sold to B. L. Ryan and Lake Shore Corporation, and it reported the difference of $50,001 ($60,001, selling price, minus $10,000) as a long term gain. The Commissioner, in his deficiency notice dated February 5, 1943, determined that the said interests had no basis and that the entire $60,001 was includible in petitioner's taxable income for the year 1940 as gains from the sale or exchange of securities.

Subsequent to the receipt of a thirty-day letter dated May 23, 1942, from the internal revenue agent in charge, Louisville, Kentucky, asserting a deficiency in personal holding company surtax, together with a penalty thereon, the petitioner, on July 13, 1942, filed a nontaxable purported delinquent return of personal holding company (Form 1120H), together with schedule attached for the year 1940, with the collector of internal revenue, second district of Texas. Subsequently, the accounting firm of Thomas, Bootz & Thomas, Evansville, Indiana, by E. E. Thomas, mailed a revised statement of income and expenses to replace the schedule attached to the purported delinquent personal holding company return. The revised schedule was received by the collector of internal revenue, second district of Texas, July 27, 1942.

Petitioner's 1940 return on Form 1120 reported total income of $56,-708.29 and total deductions of $13,256.44. Income items reported were:

Interest on bonds, $185; rents, $1,315.25; royalties, $6,011.53; net long term capital gain, $49,163.57; and sundry income, $32.94. The income and expense items reported by petitioner on Form 1120H, hereinabove mentioned, were the same items reported on Form 1120, except for a small change in net long term capital gain, which was reported as $49,096.57.

In its income tax return for 1940 the petitioner claimed as a deduction the sum of $3,100 as representing the cost basis of approximately 31 acres of land covered by the Obenhaus survey and included in the tract of land described in the deed of purchase of the Plow Realty Co. and included in the lease to the Shell Oil Co., which tract for identification was known as the Bertha Felker tract. The tract of 31 acres was covered by two different land surveys. The first one was the I. & G. N. survey and the later one known as the Obenhaus survey. The two surveys overlapped to the extent of said 31 acres of land. The Plow Realty Co. had purchased the Obenhaus survey. The I. & G. N. survey was owned by others. The lessee, Shell Oil Co., in making a survey of the lands in 1939, discovered that the Obenhaus survey, which was made on the then existing fence lines, which were more or less irregular, was short the 31 acres. The lease plot draft in the lease with Shell Oil Co. included the 31-acre tract. The taxpayer was first advised in the year 1940 of the loss by adverse possession of said tract of land. The Commissioner, in determining the deficiencies herein involved for the year 1940, disallowed a claim for this loss.

The first issue is governed by section 502 (b), Internal Revenue Code, which, so far as pertinent hereto, provides as follows:

For the purposes of this subchapter the term ."personal holding company income" means the portion of the gross income which consists of:

*     *     *     *     *     *     *

(b) * * * gains from the sale or exchange of stock or securities.

If the gains realized by petitioner from the conveyances to B. L. Ryan and Lake Shore Corporation were gains from the sale of "securities," the petitioner is subject to the graduated surtaxes imposed on personal holding company income by section 500 of the code, because it will have satisfied the gross income requirement and the stock ownership requirement of section 501 of the code, which defines the term "personal holding company." The other provision of the code need not be quoted, as the issue is narrowly confined to whether the "mineral deeds" herein are "securities" for income tax purposes.

The term "securities" is not defined by the provisions of the code relating to personal holding companies. The Commissioner has defined "stock or securities" in section 19.502–1 of Regulations 103, which

is set forth in the margin.[1]  The portion of the definition of securities which is pertinent to this issue is the inclusion of "certificates of interest or participation in any profit-sharing agreement, or in any oil, gas or other mineral royalty, or lease,   *   *   *" within the statutory definition of "personal holding company income."

Respondent stands squarely on the proposition that the "mineral deeds" herein were "securities" under his regulations interpreting the personal holding company income statute.  He contends that the interest retained by petitioner under the lease constituted a royalty interest and cites *Kiesau Petroleum Corporation*, 42 B. T. A. 69, that petitioner sold part of its royalty interest, and that the "mineral deeds" effected no sale of realty as such, but were certificates of interest or participation in an oil, gas, or mineral royalty within the meaning of the regulations interpreting the statutory term "securities."  He relies upon *Bamma Baucum*, 17 B. T. A. 1312, reversed on another point in *Lucas* v. *Baucum*, 50 Fed. (2d) 803.

Petitioner contends that the mineral deeds were conveyances of an interest in the land, a one-fourth interest in the mineral content thereof in place; that title thereto passed before the severance of the minerals from the land; that from the time the instruments were executed one-fourth interest in the minerals was owned by the grantees, regardless of whether the minerals remained in the ground or were extracted; and that, since the deeds were outright, effectual conveyances of an interest in the minerals, said deeds were not "securities" within the meaning of section 502 (b) of the code and the gains realized were not "personal holding company income."

We agree with petitioner that the instruments in question conveyed interests in realty, namely, undivided interests in the mineral content. *Hoffman* v. *Magnolia Petroleum Co.*, 273 S. W. 828; *Mitchell* v. *Simms*, 63 S. W. (2d) 371, 373; *Jones* v. *Bedford*, 56 S. W. (2d) 305.  The

---

[1] SEC. 19.502–1. *Personal holding company income.*—The term "personal holding company" means the portion of the gross income which consists of the following :

*          *          *          *          *          *          *

(5) *Gains from the sale or exchange of stock or securities.*—The term "gains from the sale or exchange of stock or securities" as used in section 502 (b) applies to all gains (including gains from liquidating dividends and other distributions from capital) from the sale or exchange of stock or securities includible in gross income.  The term "stock or securities" as used in section 502 (b) includes shares or certificates of stock, or interest in any corporation (including any joint-stock company, insurance company, association, or other organization classified as a corporation by the Internal Revenue Code), certificates of interest or participation in any profit-sharing agreement, or in any oil, gas, or other mineral royalty, or lease, collateral trust certificates, voting trust certificates, stock rights or warrants, bonds, debentures, certificates of indebtedness, notes, car trust certificates, bills of exchange, obligations issued by or on behalf of a Government, State, Territory, or political subdivision thereof.  In the case of "regular dealers in stock or securities" the term does not include gains derived from the sale or exchange of stock or securities made in the normal course of business.  The term "regular dealer in stock or securities" means corporations with an established place of business regularly engaged in the purchase of stock or securities and their resale to customers, but such corporations are not dealers with respect to stock or securities held for speculation or investment.

granting clauses so recite. Each instrument specifically provides that the grantor "does hereby grant, bargain, sell and convey  *  *  * an undivided one-eighth (⅛) interest in and to all of the oil, gas, sulphur and other minerals  *  *  * in, on and under the" described land. The interests conveyed contributed proportionately to the seven-eighths working interest in production under the outstanding Shell lease and the lessee was entitled to its seven-eighths of production from each of the undivided interests conveyed in like manner as it was entitled to its seven-eighths of production from the undivided interest remaining in the grantor. The situation was no different in effect than if petitioner, Ryan, and Lake Shore Corporation had joined in the lease. Clearly, the petitioner conveyed more than a mere royalty interest. A royalty interest under the lease would expire with the termination of the lease, *Kiesau Petroleum Corporation, supra,* p. 75, but these interests were to continue for 20 years, regardless of the termination of the Shell lease or any other lease thereafter executed by the grantor during the term of the conveyances. Any royalties received by the grantees under the present conveyances would come to them by virtue of their purchase and ownership of an undivided interest in the minerals, and not by virtue of any purchase of a fractional part of the grantor's one-eighth royalty reserved under the Shell lease.

The next question is whether the "mineral deeds" can, nevertheless, be considered "securities" for tax purposes. Again we approve the petitioner's reasoning. The instruments before us are not commonly known or referred to as securities. The instant deeds are not in form or in substance like the certificates of interest or participation utilized by business enterprises, syndicates, pools, or promoters to represent the share of the holder of the certificate in a joint project or undertaking. Under securities and exchange acts mineral deeds and assignments of mineral rights have been held to be "securities." *Securities and Exchange Commission* v. *Joiner Leasing Corporation,* 320 U. S. 344; *State* v. *Pullen,* 192 Atl. 473. But here we have a revenue statute and not a question of the exercise of police power by a state or the National Government for the protection of the public. The respondent's regulation defines "stock or securities" in broad and comprehensive language, but even so, we do not think that the instruments herein can be classified as securities under the revenue act. Cf. *Wellington Fund, Inc.,* 4 T. C. 185. What we have here is two deeds of conveyance evidencing two private sales of undivided interests in realty, under which title passed to and became vested in the grantees. Such sales do not, in our opinion, under the circumstances here constitute a sale of securities under respondent's regulations. We find nothing *contra* to this holding in the two cases cited by respondent. On the first issue, therefore, we hold that petitioner is not a personal

holding company and is not subject to the graduated surtax imposed on the income of such companies.

In view of our determination that petitioner is not a personal holding company, the penalty determined by respondent for failure of petitioner to timely file a personal holding company return on Form 1120H must likewise be decided against respondent.

The third issue involves the basis for computing gain on the property sold to Ryan and Lake Shore Corporation. Petitioner has arbitrarily fixed a basis of $10,000, apparently upon the theory that the land and three-fourths of the mineral cost its predecessor $38,442; that it later bought the outstanding one-fourth mineral interest; that the land was worthless except for cattle grazing and hunting privileges; and that, therefore, the entire cost should be allocated to the mineral content. Respondent contends that petitioner's predecessor purchased the acreage in 1908 at an approximate cost of $6 per acre; that the acreage, although not adaptable to agricultural purposes, could be and was used for the grazing of cattle; that between 1908 and 1939 petitioner realized no income from oil, gas, or other exploration; and that, therefore, there is no reason to conclude that the land was originally purchased solely for its mineral content. Respondent asserts that the absurdity of petitioner's allocation of all cost to the mineral content is clearly illustrated by the acquisition of one-fourth of the mineral content for a stated consideration of $1. He insists that the evidence of record supports the proposition that the land was purchased for its cattle-raising qualities and substantially all of the purchase price is allocable to the surface as distinguished from the possible mineral content. In any event he asserts that the burden is on the petitioner, that it has failed to sustain that burden, and that, therefore, his determination that the interests sold had no basis must stand.

On this issue we agree with respondent that petitioner has failed to establish a cost basis for the undivided interests it conveyed. No allocation of the purchase price between land and minerals was made in 1908 when the property was acquired, and petitioner has produced no testimony, expert or otherwise, that affords a basis for an allocation of the cost or any basis of fair market value as of March 1, 1913. Petitioner concedes its books and records afford no basis for any allocation. In the absence of a showing of some basis for the mineral content, we approve the Commissioner's determination on this issue.

The final issue is whether petitioner is entitled to a loss deduction of $3,100 representing the alleged cost basis of approximately 31 acres of land covered by the Obenhaus survey. Petitioner is entitled to no relief on this issue. In our opinion it merely acquired 31

acres less than it thought it had acquired by the purchase. As the transaction was entered into for profit, gain or loss will be determined upon completition thereof and not by virtue of any claimed loss because the tract was 31 acres short. On this issue we hold for the respondent.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

MELLOTT, *J.*, concurs only in the result.

---

HILL, *J.*, dissenting: The majority holds that petitioner was not a personal holding company within the provisions of section 502 (b) of the Internal Revenue Code for the reason that the income involved does not represent gains "from the sale or exchange of stock or securities."

Treasury Regulations 103, section 19.502–5, defines "stock and securities" as used in such section as including "certificates of interest or participation in any profit-sharing agreement, or in any oil, gas or other mineral royalty, or lease * * *." Apparently the majority does not question the validity or interpretative correctness of this provision of the regulations, but holds that the "gains" here involved are not covered by it. I do not agree with this holding.

The burden of the argument of the majority in support of its conclusion is that the instruments of conveyance to Ryan and the Lake Shore Corporation of interests "in and to all the oil, gas, * * * in, on and under" the described lands were conveyances of title to an interest in the land, namely, a one-fourth interest in the mineral content thereof in place, and were not certificates of interest as specified in the quoted provision of the regulations.

In holding that the instruments in question conveyed interests in realty, namely, undivided interests in the mineral content, the majority relies on two factors, (1) the recital in the granting clause, and (2) the provision that the interests were to continue for 20 years, regardless of the termination of the Shell or other leases. The mere recital in an instrument that it is a debenture does not make it so. We look to the rights enumerated therein. So, here, despite the granting clause, every right and the absence of every right thereafter enumerated indicates clearly that there was no conveyance of undivided interests in the mineral content in place. (1) The "grantee" is given one-eighth of the royalties from the Shell lease, but no part of the annual rentals paid to keep the lease in force. (2) The "grant" runs after 20 years only if and so long as minerals are being produced or mined on the property. If operations cease for any reason despite the continued existence of minerals in place, the "contract" becomes null

and void. This provision clearly negatives the idea that the instrument conveys an interest in the mineral content in place. The essence of such a right is the continued ownership of the mineral content, whether or not it is being mined or produced. (3) The "grantee" is expressly given "no interest in any bonus money or rentals received by Grantor in any future lease," (4) nor does he "acquire any right to participate in the making of future oil, gas or other mineral leases. * * *" If the grantee were an owner of the minerals in place, surely he would have the right to participate in the making of future leases and would share in any and all payments made under such future leases. This express denial of the right to participate in the making of future leases indicates that the majority must be mistaken in saying that "The situation was no different in effect than if petitioner, Ryan and Lake Shore Corporation had joined in the lease." (5) The "grantee" does not "acquire any right * * * of participating in any rental to be paid for the privilege of deferring the commencement of a well under any lease, now or hereafter." (6) "It shall not be necessary for the Grantee to join in any such lease or leases so made; * * * Grantee shall receive under such lease or leases one-sixty fourth ($\frac{1}{64}$) part of all oil, gas and other minerals * * * out of the royalty provided for in such lease or leases."

After this whittling down of the so-called grant it seems clear that all the grantee was given is a share in the royalties and a contract to share in royalties under future leases. The majority may well be right in saying that "clearly the petitioner conveyed more than a mere royalty interest under the existing lease. A royalty interest under that lease would expire with the termination of the lease. * * *" But that something "more" did not amount to an undivided interest in the minerals in place. It amounted solely to a contract right to share in royalties under future leases, which contract right was expressly declared to terminate when minerals cease to be produced or mined, even though they may still be there. These certificates of interest or participation in a profit-sharing agreement, or in oil, gas, or other mineral royalties or leases, are within the regulations.

Furthermore, even if these instruments were intended to convey rights to the oil and gas in place, the fact that by Texas law such a conveyance is one of realty would not have effect in disturbing the uniform application of the Federal taxing statute. Where instruments of this sort are within the intendment of the Internal Revenue Code and the regulations, state nomenclature may not interfere. The taxing statute and regulations thereunder may not be circumscribed by state nomenclature. In *Burnet* v. *Harmel*, 287 U. S. 103, the Supreme Court disregarded for tax purposes the fact that by Texas law an oil and gas lease operates as a present sale of the oil and gas in place. The Court there said (p. 110):

Here we are concerned only with the meaning and application of a statute enacted by Congress, in the exercise of its plenary power under the Constitution to tax income. The exertion of that power is not subject to state control. It is the will of Congress which controls, and the expression of its will in legislation, in the absence of language evidencing a different purpose, is to be interpreted so as to give a uniform application to a nation-wide scheme of taxation. * * * State law may control only when the operation of the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law. * * *

"If it is found in a given case that an interest or right created by local law was the object intended to be taxed, the federal law must prevail no matter what name is given to the interest or right by state law." *Morgan* v. *Commissioner*, 309 U. S. 78. As was said in *Commissioner* v. *Fleming*, 82 Fed. (2d) 324, 326:

Now in Texas, oil and gas in the ground are capable of ownership and sale separate from the soil which contains them, and leases such as are here involved convey to the lessee title to the oil and gas except such interests as are reserved to the lessor. In Louisiana and many other states this is not true, but the lease only gives the lessee the right to use the land to capture the oil and gas which belong fully to no one until reduced to possession. Nevertheless, in order to give the Federal income tax laws a uniform operation throughout the United States, these local differences are ignored in dealing with income and deductions; * * *

See also *Bamma Baucum*, 17 B. T. A. 1312.

Although the majority states that these instruments are not commonly known or referred to as securities, it admits that respondent's regulation defines "stock or securities" in broad and comprehensive language, and "mineral deeds" have been held to be securities within the meaning of both the Securities Act of Rhode Island and the Federal Securities Act of 1933, and are specifically so designated in the Texas Securities Act. In *State* v. *Pullen*, 192 Atl. 473, the court said:

* * * That these oil royalties are, under the law of Texas, deemed to be real estate, and that said "Mineral Deeds" are instruments conveying an interest in realty, is of no importance in our consideration of them in connection with the Securities Act of this State. The mere fact that this deed and this transfer order are treated in Texas as instruments conveying an interest in land does not preclude their being considered in this State also as securities, evidencing an investment in an oil development project.

In *Securities and Exchange Commission* v. *Joiner Leasing Corporation*, 320 U. S. 344, 352, the question was whether assignments of oil leases were "securities" within the meaning of section 2(1) of the act, 15 U. S. C., § 77b (1), which provides:

The term "security" means * * * certificate of interest or participation in any profit-sharing agreement, * * * investment contract, * * * fractional undivided interest in oil, gas, or other mineral rights, * * *

In holding the instruments to be securities within this definition, the Court said:

Nor can we agree with the court below that defendants' offerings were beyond the scope of the Act because they offered leases and assignments which under Texas law conveyed interests in real estate. * * *

Indeed, as was there pointed out in footnote 14, page 354:

In Texas itself, oil and gas leases have been held by the Supreme Court to be securities within the state act, notwithstanding the fact that the act expressly includes only "an interest in or under" such leases. *Kadane* v. *Clark*, 135 Tex. 496, 143 S. W. 2d. 197.

OPPER, *J.*, agrees with this dissent.