

Villanova University School of Law Digital Repository

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-14-2006

# Lattera v. Commissioner IRS

Precedential or Non-Precedential: Precedential

Docket No. 04-4721

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Lattera v. Commissioner IRS" (2006). *2006 Decisions*. Paper 1506.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1506

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 04-4721
_____

GEORGE LATTERA; ANGELINE LATTERA,

Appellants

v.

COMMISSIONER OF INTERNAL REVENUE

_____

Appeal from the Decision of the
United States Tax Court
Docket No. 03-4269
Tax Court Judge: Honorable Juan F. Vasquez

_____

Argued January 9, 2006

Before: BARRY and AMBRO, Circuit Judges,
and DEBEVOISE,[*] District Judge
_____

[*] Honorable Dickinson R. Debevoise, Senior District
Court Judge for the District of New Jersey, sitting by

(Opinion filed February 14, 2006)

Mark E. Cedrone, Esquire (Argued)
Cedrone & Janove
150 South Independence Mall West
Suite 940 Public Ledger
Building, 6th & Chestnut Streets
Philadelphia, PA   19106

      Counsel for Appellants

Eileen J. O'Connor
   Assistant Attorney General
Regina S. Moriarty, Esquire (Argued)
Richard Farber, Esquire
United States Department of Justice
Tax Division
P.O. Box 502
Washington, DC   20044

      Counsel for Appellee

---

OPINION OF THE COURT

---

---

designation.

AMBRO, <u>Circuit Judge</u>

Lottery winners, after receiving several annual installments of their lottery prize, sold for a lump sum the right to their remaining payments. They reported their sale proceeds as capital gains on their tax return, but the Internal Revenue Service (IRS) classified those proceeds as ordinary income. The substitute-for-ordinary-income doctrine holds that lump-sum consideration substituting for something that would otherwise be received at a future time as ordinary income should be taxed the same way. We agree with the Commissioner of the IRS that the lump-sum consideration paid for the right to lottery payments is ordinary income.

## I. Factual Background and Procedural History

In June 1991 George and Angeline Lattera turned a one-dollar lottery ticket into $9,595,326 in the Pennsylvania Lottery. They did not then have the option to take the prize in a single lump-sum payment, so they were entitled to 26 annual installments of $369,051.

In September 1999 the Latteras sold their rights to the 17 remaining lottery payments to Singer Asset Finance Co., LLC for $3,372,342. Under Pennsylvania law, the Latteras had to obtain court approval before they could transfer their rights to future lottery payments, and they did so in August 1999.

3

On their joint tax return, the Latteras reported this sale as the sale of a capital asset held for more than one year. They reported a sale price of $3,372,342, a cost or other basis of zero, and a long-term capital gain of the full sale price. The Commissioner determined that this sale price was ordinary income. In December 2002 the Latteras were sent a notice of deficiency of $660,784.[1]

In March 2003 the Latteras petitioned the Tax Court for a redetermination of the deficiency. The Court held in favor of the Commissioner. The Latteras now appeal to our Court.

## II.  Jurisdiction and Standard of Review

The Tax Court had subject matter jurisdiction under I.R.C. § 7442. Because its decision was final, we have appellate jurisdiction under I.R.C. § 7482(a)(1). The Latteras reside in our Circuit, so venue is proper under I.R.C. § 7482(b)(1)(A).

We review the Tax Court's legal determinations *de novo*, but we do not disturb its factual findings unless they are clearly erroneous. *Estate of Meriano v. Comm'r*, 142 F.3d 651, 657 (3d Cir. 1998).

---

[1] The parties' stipulation of facts states this number as $660,748, but the notice of deficiency reads $660,784.

4

### III. Discussion

The lottery payments the Latteras had a right to receive were gambling winnings, and the parties agree that the annual payments were ordinary income. *Cf. Comm'r v. Groetzinger*, 480 U.S. 23, 32 n.11 (1987) (calling a state lottery "public gambling" in a case treating gambling winnings as ordinary income). But the Latteras argue that when they sold the right to their remaining lottery payments, that sale gave rise to a long-term capital gain.

Whether the sale of a right to lottery payments by a lottery winner can be treated as a capital gain under the Internal Revenue Code is one of first impression in our Circuit. But it is not a new question. Both the Tax Court and the Ninth Circuit Court of Appeals have held that such sales deserve ordinary-income treatment. *United States v. Maginnis*, 356 F.3d 1179, 1181 (9th Cir. 2004) ("Fundamental principles of tax law lead us to conclude that [the] assignment of [a] lottery right produced ordinary income."); *Davis v. Comm'r*, 119 T.C. 1, 1 (2002); *see also Watkins v. Comm'r*, 88 T.C.M. (CCH) 390, 393 (2004); *Clopton v. Comm'r*, 87 T.C.M. (CCH) 1217, 1217 (2004); *Boehme v. Comm'r*, 85 T.C.M. (CCH) 1039, 1041 (2003).

The Ninth Circuit's reasoning has drawn significant criticism, however. *See* Matthew S. Levine, Case Comment, *Lottery Winnings as Capital Gains*, 114 Yale L.J. 195, 197–202 (2004); Thomas G. Sinclair, Comment, *Limiting the Substitute-*

*for-Ordinary Income Doctrine: An Analysis Through Its Most Recent Application Involving the Sale of Future Lottery Rights*, 56 S.C. L. Rev. 387, 421–22 (2004). In this context, we propose a different approach. We begin with a discussion of basic concepts that underlie our reasoning.

## A. Definition of a capital asset

A long-term capital gain (or loss) is created by the "sale or exchange of a capital asset held for more than 1 year." I.R.C. § 1222(3). Section 1221 of the Internal Revenue Code defines a capital asset as "property held by the taxpayer (whether or not connected with his trade or business)." This provision excludes from the definition certain property categories, none of which is applicable here.[2]

---

[2] Section § 1221, as it read when the Latteras sold their lottery rights, contained five exceptions (stock in trade of the taxpayer, depreciable trade or business property, copyrights, accounts receivable acquired in the ordinary course of trade or business, and Government publications). The provision was amended in December 1999 to exclude also commodities derivative financial instruments held by dealers, hedging transactions, and supplies used or consumed in trade or business. Tax Relief Extension Act of 1999, Pub. L. No. 106-170, tit. V, § 532(a), 113 Stat. 1860, 1928–30. These exclusions are not applicable to this case; the amendments did not apply to transactions entered into before December 17, 1999, *see id.* § 532(d), 113 Stat. at 1931, and the Latteras sold their lottery

A 1960 Supreme Court decision suggested that this definition can be construed too broadly, stating that "it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset." *Comm'r v. Gillette Motor Transp., Inc.*, 364 U.S. 130, 134 (1960). The Court noted that it had "long held that the term 'capital asset' is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." *Id.* But the Supreme Court's decision in *Arkansas Best Corp. v. Commissioner*, 485 U.S. 212 (1988), at least at first blush, seems to have reversed that narrow reading. *Arkansas Best* suggests instead that the capital-asset definition is to be broadly construed. *See id.* at 218 ("The body of § 1221 establishes a general definition of the term 'capital asset,' and the phrase 'does not include' takes out of that broad definition only the classes of property that are specifically mentioned.").

## B. The substitute-for-ordinary-income doctrine

The problem with an overly broad definition for capital assets is that it could "encompass some things Congress did not intend to be taxed as capital gains." *Maginnis*, 356 F.3d at 1181. An overly broad definition, linked with favorable capital-

rights in September 1999.

gains tax treatment, would encourage transactions designed to convert ordinary income into capital gains. *See id.* at 1182. For example, a salary is taxed as ordinary income, and the right to be paid for work is a person's property. But it is hard to conceive that Congress intends for taxpayers to get capital-gains treatment if they were to sell their rights (*i.e.*, "property held by the taxpayer") to their future paychecks. *See* 2 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 47.1 (3d ed. 2000).

To get around this problem, courts have created the substitute-for-ordinary-income doctrine. This doctrine says, in effect, that "'lump sum consideration [that] seems essentially a substitute for what would otherwise be received at a future time as ordinary income' may not be taxed as a capital gain." *Maginnis*, 356 F.3d at 1182 (quoting *Comm'r v. P.G. Lake, Inc.*, 356 U.S. 260, 265 (1958)) (alteration in original).

The seminal substitute-for-ordinary-income case is the 1941 Supreme Court decision in *Hort v. Commissioner*, 313 U.S. 28 (1941). Hort had inherited a building from his father, and one of the building's tenants canceled its lease, paying Hort a cancellation fee of $140,000. *Id.* at 29. Hort argued that the cancellation fee was capital gain, but the Court disagreed, holding that the cancellation fee was ordinary income because the "cancellation of the lease involved nothing more than relinquishment of the right to future rental payments in return

8

for a present substitute payment and possession of the leased premises." *Id.* at 32.

The Supreme Court bolstered the doctrine in *Lake*. P.G. Lake, Inc. was an oil- and gas-producing company with a working interest in two oil and gas leases. 356 U.S. at 261–62. It assigned an oil payment right "payable out of 25 percent of the oil attributable to [Lake's] working interest in the two leases." *Id.* at 262. Lake reported this assignment as a sale of property taxable as capital gain. *Id.* But the Court disagreed, holding that the consideration received was taxable as ordinary income. *Id.* at 264. The Court's reasoning gave full voice to the substitute-for-ordinary-income doctrine: "The lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income." *Id.* at 265.

Our Court has rarely dealt with this doctrine. We have only cited *Lake* twice—once in 1958, *Tunnell v. United States*, 259 F.2d 916, 918 (3d Cir. 1958), and once in 1974, *Hempt Bros., Inc. v. United States*, 490 F.2d 1172, 1176, 1178 (3d Cir. 1974) (citing *Lake* with approval, but deciding the case under a § 351—nonrecognition of transfers of property for corporate stock—analysis).

The Latteras argue that the substitute-for-ordinary-income doctrine, which takes "property held by the taxpayer" outside the statutory capital-asset definition, did not survive

9

*Arkansas Best*. But although *Arkansas Best* ostensibly cabined the exceptions to the statutory definition, it made clear that the *Hort–Lake* "line of cases, based on the premise that § 1221 'property' does not include claims or rights to ordinary income, ha[d] no application in the present context." *Arkansas Best*, 485 U.S. at 217 n.5. The Tax Court has several times confirmed that *Arkansas Best* "in no way affected the viability of the principle established in the [*Hort–Lake*] line of cases." *Davis*, 119 T.C. at 6 (citing cases). And the Ninth Circuit agrees. *Maginnis*, 356 F.3d at 1185. We follow suit, holding that the substitute-for-ordinary-income doctrine remains viable in the wake of *Arkansas Best*.

But there is a tension in the doctrine: in theory, all capital assets are substitutes for ordinary income. *See, e.g.*, William A. Klein *et al.*, *Federal Income Taxation* 786 (12th ed. 2000) ("A fundamental principle of economics is that the value of an asset is equal to the present discounted value of all the expected net receipts from that asset over its life."); *see also Lake*, 356 U.S. at 266 (noting that the lump-sum consideration—held to be ordinary income—paid for an asset was "the present value of income which the recipient would otherwise obtain in the future"). For example, a stock's value is the present discounted value of the company's future profits. *See, e.g.*, *Maginnis*, 356 F.3d at 1182; *cf. United States v. Dresser Indus., Inc.*, 324 F.2d 56, 59 (5th Cir. 1963) (applying this concept to the value of land). "[R]ead literally, the [substitute-for-ordinary-income] doctrine would completely swallow the concept of capital

10

gains." Levine, *supra*, at 196; *accord* 2 Bittker & Lokken, *supra*, ¶ 47.9.5, at 47-68 ("Unless restrained, the substitute-for-ordinary-income theory thus threatens even the most familiar capital gain transactions."). Also, an "overbroad 'substitute for ordinary income' doctrine, besides being analytically unsatisfactory, would create the potential for the abuse of treating capital losses as ordinary."[3] Levine, *supra*, at 197. The doctrine must therefore be limited so as not to err on either side.

## C.     The lottery cases

Even before the Ninth Circuit decided *Maginnis*, the Tax Court had correctly answered the question of whether sales of lottery winnings were capital gains. In *Davis v. Commissioner*, lottery winners had sold their rights to 11 of their total 14 future lottery payments for a lump sum. 119 T.C. at 3. The Tax Court found that the lump-sum payment to the lottery winners was the "discounted value . . . of certain ordinary income which they otherwise would have received during the years 1997 through 2007." *Id.* at 7. The Court held, therefore, that (1) the purchaser of the lottery payment rights paid money for "the right to receive . . . future ordinary income, and not for an increase in the value of income-producing property"; (2) the lottery winners' right to their future lottery payments was not a capital asset; and (3) the lump-sum payment was to be taxed as ordinary income.

---

[3] Note that our holding in this case does not consider the substitute-for-ordinary-income doctrine in loss transactions.

11

*Id.*; *see also Watkins*, 88 T.C.M. (CCH) at 393 (following *Davis*, in a post-*Maginnis* decision); *Clopton*, 87 T.C.M. (CCH) at 1219 (citing Tax Court cases following *Davis*).

In 2004 the Ninth Circuit decided *Maginnis*, the first (and so far only) appellate opinion to deal with this question. Maginnis won $9 million in a lottery and, after receiving five of his lottery payments, assigned all of his remaining future lottery payments to a third party for a lump-sum payment of $3,950,000. *Maginnis*, 356 F.3d at 1180. The Ninth Circuit held that Maginnis's right to future lottery payments was not a capital asset and that the lump-sum payment was to be taxed as ordinary income. *Id.* at 1182.

The Court relied on the substitute-for-ordinary-income doctrine, but it was concerned about taking an "approach that could potentially convert all capital gains into ordinary income [or] one that could convert all ordinary income into capital gains." *Id.* The Court opted instead for "case-by-case judgments as to whether the conversion of income rights into lump-sum payments reflects the sale of a capital asset that produces a capital gain, or whether it produces ordinary income." *Id.* It set out two factors, which it characterized as "crucial to [its] conclusion," but not "dispositive in all cases": "Maginnis (1) did not make any underlying investment of capital in return for the receipt of his lottery right, and (2) the sale of his right did not reflect an accretion in value over cost to any underlying asset Maginnis held." *Id.* at 1183.

12

But two commentators have criticized the analysis in *Maginnis*, especially the two factors. *See* Levine, *supra*, at 197–202; Sinclair, *supra*, at 421–22. The first factor—underlying investment of capital—would theoretically subject all inherited and gifted property (which involves no investment at all) to ordinary-income treatment. *See* Levine, *supra*, at 198. It also does not explain the result in *Lake*, where the company presumably made an investment in its working interest in oil and gas leases, yet the Supreme Court applied ordinary-income treatment. *Id.*

The second factor also presents analytical problems. Not all capital assets experience an accretion in value over cost. For example, cars typically depreciate, but they are often capital assets. *See* Sinclair, *supra*, at 421. Levine criticizes the second factor for "attempt[ing] to determine the character of a gain from its amount." Levine, *supra*, at 199. The *Maginnis* Court held that there was no accretion of value over cost in lottery winnings because there was no cost, as "Maginnis did not make any capital investment in exchange for his lottery right." 356 F.3d at 1184. But if Maginnis's purchase of a lottery ticket had been a capital investment, would the second factor automatically have been satisfied? (That is, the "cost" in that scenario would have been $1, and the increase would have been $3,949,999.) Our first instinct is no. Moreover, the second factor does not seem to predict correctly the result in both *Hort* (where a building was inherited for no "cost") and *Lake* (where the

13

working interest in the oil lease presumably had a "cost"), in both of which the taxpayer got ordinary-income treatment.

Thus, while we agree with *Maginnis*'s result, we do not simply adopt its reasoning.  And it is both unsatisfying and unhelpful to future litigants to declare that we know this to be ordinary income when we see it.  The problem is that, "[u]nless and until Congress establishes an arbitrary line on the otherwise seamless spectrum between *Hort–Lake* transactions and conventional capital gain transactions, the courts must locate the boundary case by case, a process that can yield few useful generalizations because there are so many relevant but imponderable criteria."  2 Bittker & Lokken, *supra*, ¶ 47.9.5, at 47-69 (footnote omitted).

We therefore proceed to our case-by-case analysis, but in doing so we set out a method for analysis that guides our result.  At the same time, however, we recognize that any rule we create could not account for every contemplated transactional variation.

**D.      Substitute-for-ordinary-income analysis**

In our attempt to craft a rubric, we find helpful a Second Circuit securities case and a recent student comment.  The Second Circuit dealt with a similarly "seamless spectrum" in 1976 when it needed to decide whether a note was a security for purposes of section 10(b) of the 1934 Securities and Exchange

Act. *See Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976). The Court created a "family resemblance" test, (1) presuming that notes of more than nine months' maturity were securities, (2) listing various types of those notes that it did not consider securities, and (3) declaring that a note with maturity exceeding nine months that "does not bear a strong family resemblance to these examples" was a security. *Id.* at 1138, 1137–38. The Supreme Court, adopting this test in 1990, added four factors to guide the "resemblance" analysis: the motivations of the buyers and sellers, the plan of distribution, the public's reasonable expectations, and applicable risk-reducing regulatory schemes. *Reves v. Ernst & Young*, 494 U.S. 56, 65–67 (1990).

We adopt an analogous analysis. Several types of assets we know to be capital: stocks, bonds, options, and currency contracts, for example. *See, e.g.*, *Arkansas Best*, 485 U.S. at 222–23 (holding—even though, as noted above, the value of a stock is really the present discounted value of the company's future profits—that "stock is most naturally viewed as a capital asset"); *see also id.* at 217 n.5 (distinguishing "capital stock" from "a claim to ordinary income"); *Simpson v. Comm'r*, 85 T.C.M. (CCH) 1421, 1423 n.7 (2003) (distinguishing "currency contracts, stocks, bonds, and options" from a right to receive lottery payments). We could also include in this category physical assets like land and automobiles.

15

Similarly, there are several types of rights that we know to be ordinary income, *e.g.*, rental income and interest income. In *Gillette Motor*, the Supreme Court held that ordinary-income treatment was indicated for the right to use another's property—rent, in other words. *See* 364 U.S. at 135. Similarly, in *Midland-Ross*, the Supreme Court held that earned original issue discount should be taxed as ordinary income. *See United States v. Midland-Ross Corp.*, 381 U.S. 54, 58 (1965). There, the taxpayer purchased non-interest-bearing notes at a discount from the face amount and sold them for more than their issue price (but still less than the face amount). *Id.* at 55. This gain was conceded to be equivalent to interest, and the Court held it taxable as ordinary income. *Id.* at 55–56, 58.

For the "family resemblance" test, we can set those two categories at the opposite poles of our analysis. For example, we presume that stock, and things that look and act like stock, will receive capital-gains treatment. For the in-between transactions that do not bear a family resemblance to the items in either category, like contracts and payment rights, we use two factors to assist in our analysis: (1) type of "carve-out" and (2) character of asset.[4]

    1.     *Type of carve-out*

---

[4] We borrow these factors from Thomas Sinclair's comment, *see* Sinclair, *supra*, at 401–03, but we differ from him slightly in the way we apply the character factor.

The notion of the carve-out, or partial sale, has significant explanatory power in the context of the *Hort–Lake* line of cases. As Marvin Chirelstein writes, the "'substitute' language, in the view of most commentators, was merely a short-hand way of asserting that carved-out interests do not qualify as capital assets." Marvin A. Chirelstein, *Federal Income Taxation* ¶ 17.03, at 369–70 (9th ed. 2002).

There are two ways of carving out interests from property: horizontally and vertically. A horizontal carve-out is one in which "temporal divisions [are made] in a property interest in which the person owning the interest disposes of part of his interest but also retains a portion of it." Sinclair, *supra*, at 401. In lottery terms, this is what happened in *Davis*, *Boehme*, and *Clopton*—the lottery winners sold some of their future lottery payment rights (*e.g.*, their 2006 and 2007 payments) but retained the rights to payments further in the future (*e.g.*, their 2008 and 2009 payments). *See Clopton*, 87 T.C.M. (CCH) at 1217–18 (finding that the lottery winner sold only some of his remaining lottery payments); *Boehme*, 85 T.C.M. (CCH) at 1040 (same); *Davis*, 119 T.C. at 3 (same). This is also what happened in *Hort* and *Lake*; portions of the total interest (a term of years carved out from a fee simple and a three-year payment right from a working interest in a oil lease, respectively) were carved out from the whole.

A vertical carve-out is one in which "a complete disposition of a person's interest in property" is made. Sinclair,

17

*supra*, at 401. In lottery terms, this is what happened in *Watkins* and *Maginnis*—the lottery winners sold the rights to all their remaining lottery payments. *See Maginnis*, 356 F.3d at 1181 (noting that the lottery winner assigned his right to receive all his remaining lottery payments); *Watkins*, 88 T.C.M. (CCH) at 391 (same).

Horizontal carve-outs typically lead to ordinary-income treatment. *See, e.g.*, *Maginnis*, 356 F.3d at 1185–86 ("Maginnis is correct that transactions in which a tax-payer transfers an income right without transferring his entire interest in an underlying asset will often be occasions for applying the substitute for ordinary income doctrine."). This was also the result reached in *Hort* and *Lake*. *Lake*, 356 U.S. at 264; *Hort*, 313 U.S. at 32.

Vertical carve-outs are different. In *Dresser Industries*, for example, the Fifth Circuit distinguished *Lake* because the taxpayer in *Dresser* had "cut[] off a 'vertical slice' of its rights, rather than carv[ed] out an interest from the totality of its rights." *Dresser Indus.*, 324 F.2d at 58. But as the results in *Maginnis* and *Watkins* demonstrate, a vertical carve-out does not necessarily mean that the transaction receives capital-gains treatment. *See, e.g.*, *Maginnis*, 356 F.3d at 1185 (holding "that a transaction in which a taxpayer sells his entire interest in an underlying asset without retaining any property right does not *automatically* prevent application of the substitute for ordinary income doctrine" (emphasis in original)); *see also id.* at 1186.

18

Because a vertical carve-out could signal either capital-gains or ordinary-income treatment, we must make another determination to conclude with certainty which treatment should apply. Therefore, when we see a vertical carve-out, we proceed to the second factor—character of the asset—to determine whether the sale proceeds should be taxed as ordinary income or capital gain.

## 2. *Character of the asset*

The Fifth Circuit in *Dresser Industries* noted that "[t]here is, in law and fact, a vast difference between the present sale of the future right to *earn* income and the present sale of the future right to *earned* income." *Dresser Indus.*, 324 F.2d at 59 (emphasis in original). The taxpayer in *Dresser Industries* had assigned its right to an exclusive patent license back to the patent holder in exchange for a share of the licensing fees from third-party licensees. *Id.* at 57. The Court used this "right to earn income"/"right to earned income" distinction to hold that capital-gains treatment was applicable. It noted that the asset sold was not a "right to earned income, to be paid in the future," but was "a property which would produce income." *Id.* at 59. Further, it disregarded the ordinary nature of the income generated by the asset; because "all income-producing property" produces ordinary income, the sale of such property does not result in ordinary-income treatment. *Id.* (This can be seen in the sale of stocks or bonds, both of which produce ordinary income, but the sale of which is treated as capital gain.)

19

Sinclair explains the concept in this way: "Earned income conveys the concept that the income has already been earned and the holder of the right to this income only has to collect it. In other words, the owner of the right to earned income is entitled to the income merely by virtue of owning the property." Sinclair, *supra*, at 406. He gives as examples of this concept rental income, stock dividends, and rights to future lottery payments. *Id.*; *see also Rhodes' Estate v. Comm'r*, 131 F.2d 50, 50 (6th Cir. 1942) (*per curiam*) (holding that a sale of dividend rights is taxable as ordinary income). For the right to earn income, on the other hand, "the holder of such right must do something further to earn the income. . . . [because] mere ownership of the right to earn income does not entitle the owner to income." Sinclair, *supra*, at 406. Following *Dresser Industries*, Sinclair gives a patent as an example of this concept. *Id.*

Assets that constitute a right to earn income merit capital-gains treatment, while those that are a right to earned income merit ordinary-income treatment. Our Court implicitly made this distinction in *Tunnell v. United States*, 259 F.2d 916 (3d Cir. 1958). Tunnell withdrew from a law partnership, and he assigned his rights in the law firm in exchange for $27,500. *Id.* at 917. When he withdrew, the partnership had over $21,000 in uncollected accounts receivable from work that had already been done. *Id.* We agreed with the District Court that "the sale of a partnership is treated as the sale of a capital asset." *Id.* The sale of a partnership does not, in and of itself, confer income on the

20

buyer; the buyer must continue to provide legal services, so it is a sale of the right to *earn* income. Consequently, as we held, the sale of a partnership receives capital-gains treatment. The accounts receivable, on the other hand, had already been earned; the buyer of the partnership only had to remain a partner to collect that income, so the sale of accounts receivable is the sale of the right to *earned* income. Thus, we held that the portion of the purchase price that reflected the sale of the accounts receivable was taxable as ordinary income. *Id.* at 919.

Similarly, when an erstwhile employee is paid a termination fee for a personal-services contract, that employee still possesses the asset (the right to provide certain personal services) and the money (the termination fee) has already been "earned" and will simply be paid. The employee no longer has to perform any more services in exchange for the fee, so this is not like *Dresser Industries*'s "right to earn income." These termination fees are therefore rights to earned income and should be treated as ordinary income. *See, e.g.*, *Elliott v. United States*, 431 F.2d 1149, 1154 (10th Cir. 1970); *Holt v. Comm'r*, 303 F.2d 687, 690 (9th Cir. 1962); *see also* Chirelstein, *supra*, ¶ 17.03, at 376–77 (noting that "courts have held consistently that payments made to an employee for the surrender of his employment contract are ordinary").

The factor also explains, for example, the Second Circuit's complex decision in *Commissioner v. Ferrer*, 304 F.2d 125 (2d Cir. 1962). The actor José Ferrer had contracted for the

rights to mount a stage production based on the novel *Moulin Rouge*. *Id.* at 126. In the contract, Ferrer obtained two rights relevant here: (1) the exclusive right to "produce and present" a stage production of the book and, if the play was produced, (2) a share in the proceeds from any motion-picture rights that stemmed from the book. *Id.* at 127. After a movie studio planned to make *Moulin Rouge* into a movie—and agreed that it would feature Ferrer—he sold these, along with other, rights. *Id.* at 128–29. Right (1) would have required Ferrer to have produced and presented the play to get income, so it was a right to earn income—thus, capital-gains treatment was indicated. Right (2), once it matured (*i.e.*, once Ferrer had produced the play), would have continued to pay income simply by virtue of Ferrer's holding the right, so it would have become a right to earned income—thus, ordinary-income treatment was indicated. The Second Circuit held as such, dictating capital-gains treatment for right (1) and ordinary-income treatment for right (2). *Id.* at 131, 134.[5]

---

[5] One well-known result that these factors do not predict is the Second Circuit's 1946 opinion in *McAllister v. Commissioner*, 157 F.2d 235 (2d Cir. 1946). In that case, a widow was forced to sell her life estate in a trust to the remainderman. *Id.* at 235. Thus, she received a lump-sum payment in exchange for her right to all future payments from the trust. Although this was a vertical carve-out, susceptible to both types of treatment, she gave up her right to *earned* income, because she would have continued receiving payments simply

22

### E.  Application of the "family resemblance" test

Applied to this case, the "family resemblance" test draws out as follows.  First, we try to determine whether an asset is like either the "capital asset" category of assets (*e.g.*, stocks, bonds, or land) or like the "income items" category (*e.g.*, rental income or interest income).  If the asset does not bear a family resemblance to items in either of those categories, we move to the following factors.

---

by holding the life estate.  Thus, the sale proceeds should have received ordinary-income treatment.  The Court held instead that capital-gains treatment was indicated.  *Id.* at 236.

But the result in *McAllister* has been roundly criticized.  The Tax Court in that case had held that ordinary-income treatment was proper, *id.* at 235, and Judge Frank entered a strong dissent, *id.* at 237–41 (Frank, J., dissenting).  The *McAllister* Court relied on a case that did not even discuss the capital-asset statute.  *Id.* at 237 (majority opinion).  Chirelstein writes that the "decision in *McAllister* almost certainly was wrong."  Chirelstein, *supra*, ¶ 17.03, at 373.  And a 2004 Tax Court opinion did not even bother to distinguish *McAllister*, stating simply that it was "decided before relevant Supreme Court decisions applying the substitute for ordinary income doctrine" (referring, *inter alia*, to *Lake*).  *Clopton*, 87 T.C.M. (CCH) at 1219.

We consider *McAllister* to be an aberration, and we do not find it persuasive in our decision in this case.

23

We look at the nature of the sale. If the sale or assignment constitutes a horizontal carve-out, then ordinary-income treatment presumably applies. If, on the other hand, it constitutes a vertical carve-out, then we look to the character-of-the-asset factor. There, if the sale is a lump-sum payment for a future right to *earned* income, we apply ordinary-income treatment, but if it is a lump-sum payment for a future right to *earn* income, we apply capital-gains treatment.

Turning back to the Latteras, the right to receive annual lottery payments does not bear a strong family resemblance to either the "capital assets" or the "income items" listed at the polar ends of the analytical spectrum. The Latteras sold their right to all their remaining lottery payments, so this is a vertical carve-out, which could indicate either capital-gains or ordinary-income treatment. But because a right to lottery payments is a right to earned income (*i.e.*, the payments will keep arriving due simply to ownership of the asset), the lump-sum payment received by the Latteras should receive ordinary-income treatment.

This result comports with *Davis* and *Maginnis*. It also ensures that the Latteras do not "receive a tax advantage as compared to those taxpayers who would simply choose originally to accept their lottery winning in the form of a lump

24

sum payment," something that was also important to the *Maginnis* Court. *Maginnis*, 356 F.3d at 1184.[6]

## IV. Conclusion

The lump-sum consideration paid to the Latteras in exchange for the right to their future lottery payments is ordinary income.[7] We therefore affirm.

---

[6] We do not decide whether Singer, who purchased the right to lottery payments from the Latteras, would receive ordinary income or capital gain if it later decided to sell that right to another third party. *See Maginnis*, 356 F.3d at 1183 n.4. Such a determination would need to be made on the specific facts of the transaction. For example, if Singer bought and sold such rights as part of its business, the lottery payment rights could theoretically fall under the inventory exclusion to the capital-asset definition. *Cf. Arkansas Best*, 485 U.S. at 222 (suggesting that if Arkansas Best had been a dealer in securities, its bank stock might have fallen within § 1221's inventory exclusion).

[7] The Latteras appear to argue that their lottery ticket was itself a capital asset. We do not need to address this issue, as we note that the Latteras did not sell their winning ticket to Singer. Instead, they relinquished it in 1991 to the Pennsylvania State Lottery so they could claim their prize. They sold Singer eight years later not the physical lottery ticket but their right to the annual lottery payments.