[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 19, 2007
THOMAS K. KAHN
CLERK

_____

No. 07-11568

_____

Agency No. 13434-03

ROLAND WOMACK,
MARIE WOMACK,

Petitioners-Appellants,

versus

COMMISSIONER OF IRS,

Respondent-Appellee.

_____

No. 07-11569

_____

Agency No. 19829-03

ANASTASIOS SPIRIDAKOS,
MARIA SPIRIDAKOS,

Petitioners-Appellants,

versus

COMMISSIONER OF IRS,

Respondent-Appellee.

_____

Appeals from Decisions of the
United States Tax Court
_____

**(December 19, 2007)**

Before EDMONDSON, Chief Judge, DUBINA, Circuit Judge, and MARTIN,[*] District Judge.

MARTIN, District Judge:

This is an appeal by Florida State Lottery winners from the United States Tax Court's decision that proceeds from the sale of the rights to future installment payments from lottery winnings ("Lottery Rights") are taxable as ordinary income, rather than at the lower tax rate applied to the sale of a long term capital asset. The Tax Court specifically held that Lottery Rights are not capital assets as defined in 26 U.S.C. § 1221 ("Section 1221"), under the judicially established substitute for ordinary income doctrine. We affirm.

## I.    Background

Roland Womack won a portion of an $8,000,000 Florida State Lottery ("Florida Lotto") prize on January 20, 1996. At the time, the prize was payable only in twenty annual installments of $150,000. Mr. Womack received four such

---

[*]Honorable Beverly B. Martin, United States District Judge for the Northern District of Georgia, sitting by designation.

annual installments from 1996 to 1999, and he reported those payments as ordinary income on the federal tax returns he filed jointly with his wife, Marie Womack.

In 1999, Florida amended its law to permit lottery winners to assign Lottery Rights. Fla. Stat. § 24.1153. Mr. Womack subsequently sold the right to receive the remaining sixteen payments to Singer Asset Finance Company ("Singer") in exchange for a sum of $1,328,000. The total face value of the remaining payments was $2,400,000. The Womacks reported the amount received from Singer on their 2000 joint federal income tax return as proceeds from the sale of a long term capital asset.

Maria Spiridakos is also a Florida Lotto winner. She won a $6,240,000 prize on January 6, 1990, payable in 20 annual installments of $312,000. She received ten annual payments and, from 1990 to 1999, she and her husband, Anastasios Spiridakos, reported those payments as ordinary income on their jointly filed federal income tax returns. Ms. Spiridakos sold the right to receive her remaining payments to Singer for $2,125,000, which the Spiridakoses reported on their 2000 joint federal income tax return as proceeds from the sale of a long term capital asset.[1]

---

[1]As required by Florida state law, Fla. Stat. § 24.1153(1), Mr. Womack and Ms. Spiridakos each obtained Circuit Court approval to assign their respective rights to receive future lottery winnings.

The IRS issued notices of deficiency to the Womacks and the Spiridakoses (collectively, "Taxpayers") for failure to pay tax on the lump sum payment as ordinary income. Taxpayers each filed a petition with the Tax Court seeking a redetermination. The Tax Court consolidated the petitions and denied both on November 7, 2006. Taxpayers now appeal.[2]

## II.    Standard of Review

We have jurisdiction in this case pursuant to 26 U.S.C. § 7482, which specifies that we review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). We review the Tax Court's interpretations of the Internal Revenue Code *de novo*. L.V. Castle Inv. Group, Inc. v. Comm'r, 465 F.3d 1243, 1245 (11th Cir. 2006).

## III.    Discussion

The question before us is whether Lottery Rights are "capital assets" as defined by Section 1221 of the Internal Revenue Code, 26 U.S.C. § 1221. Income representing proceeds from the sale or exchange of a capital asset that a taxpayer holds for over a year is considered a "capital gain," 26 U.S.C. § 1222(3), and is

---

[2]Including the Womacks and the Spiridakoses, 59 Florida Lotto winners have agreed to be bound by the decision in this case. Womack v. Comm'r, T.C.M. 2006-240, 2006 WL 3208890, at *1 & n.1 (Nov. 7, 2006).

4

taxed at a favorable rate.[3] Other income, or "ordinary income," is taxed at a higher

rate. Section 1221 defines a capital asset as any property the taxpayer holds, but

excludes certain items from the definition.[4] Taxpayers held their Lottery Rights for

[3]As the Tax Court noted, for the year 2000, the maximum tax rate for the payment Taxpayers received was 39.6% if ordinary income, and 20% if a capital gain. Womack v. Comm'r, T.C.M. 2006-240, 2006 WL 3208890, at *4 n.4 (Nov. 7, 2006).

[4]The definition, in full, states:

For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include--
(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;
(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by--
(A) a taxpayer whose personal efforts created such property,
(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or
(C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);
(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1);
(5) a publication of the United States Government (including the Congressional Record) which is received from the United States Government or any agency thereof, other than by purchase at the price at which it is offered for sale to the public, and which is held by--
(A) a taxpayer who so received such publication, or
(B) a taxpayer in whose hands the basis of such publication is determined, for purposes of determining gain from a sale or exchange, in whole or in part by reference to the basis of such publication in the hands of a taxpayer described in subparagraph (A);
(6) any commodities derivative financial instrument held by a commodities derivatives dealer, unless--
(A) it is established to the satisfaction of the Secretary that such instrument has no connection to the activities of such dealer as a dealer, and
(B) such instrument is clearly identified in such dealer's records as being described in subparagraph (A) before the close of the day on which it was acquired, originated, or entered into (or such other time as the Secretary may by regulations prescribe);
(7) any hedging transaction which is clearly identified as such before the close of the day on

more than one year before selling them, so Taxpayers may report the lump sum payment they received in consideration as a capital gain if Lottery Rights are considered a capital asset.

The Tax Court and the four U.S. Circuit Courts to consider the question have concluded that Lottery Rights are not a capital asset within the definition set forth in Section 1221. E.g., Prebola v. Comm'r, 482 F.3d 610 (2d Cir. 2007); Watkins v. Comm'r, 447 F.3d 1269 (10th Cir. 2006); Lattera v. Comm'r, 437 F.3d 399 (3d Cir. 2006), cert. denied, 127 S. Ct. 1328 (2007); United States v. Maginnis, 356 F.3d 1179 (9th Cir. 2004); Davis v. Comm'r, 119 T.C. 1 (2002). These decisions are based on the so-called substitute for ordinary income doctrine, which provides that when a party receives a lump sum payment as "essentially a substitute for what would otherwise be received at a future time as ordinary income" that lump sum payment is taxable as ordinary income as well. Comm'r v. P.G. Lake, Inc., 356 U.S. 260, 265, 78 S. Ct. 691, 694, 2 L. Ed. 2d 743 (1958). We agree that the substitute for ordinary income doctrine applies to Lottery Rights, and therefore that proceeds from the sale of Lottery Rights are taxable as ordinary income.

---

which it was acquired, originated, or entered into (or such other time as the Secretary may by regulations prescribe); or

    (8) supplies of a type regularly used or consumed by the taxpayer in the ordinary course of a trade or business of the taxpayer.

26 U.S.C. § 1221(a).

A.    The Substitute for Ordinary Income Doctrine

The statutory definition of capital asset "has . . . never been read as broadly as the statutory language might seem to permit, because such a reading would encompass some things Congress did not intend to be taxed as capital gains." Maginnis, 356 F.3d at 1181. Congress intended ordinary income to be the default tax rate, with capital gains treatment an exception applicable only in appropriate cases. In fact, "the term 'capital asset' is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time." Comm'r v. Gillette Motor Transp., Inc., 364 U.S. 130, 134, 80 S. Ct. 1497, 1500, 4 L. Ed. 2d 1617 (1960). This interpretation prevents taxpayers from circumventing ordinary income tax rates by selling rights to future ordinary income payments in exchange for a lump sum. See Lake, 356 U.S. at 265, 78 S. Ct. at 694.

The doctrine is attributed to four seminal Supreme Court cases: Hort v. Commissioner, Commissioner v. P.G. Lake, Inc., Commissioner v. Gillette Motor Transport, Inc., and United States v. Midland-Ross Corp. The taxpayer in Hort, 313 U.S. 28, 29, 61 S. Ct. 757, 757, 85 L. Ed. 1168 (1941), a building owner, received a lump sum in exchange for cancelling a lease on the property. The sum was taxable as ordinary income because it was "essentially a substitute" for the

7

rental payments, themselves obviously ordinary income. Id. at 31, 61 S. Ct. at 758.

In Lake, 356 U.S. at 261-62, 78 S. Ct. at 692-93, the taxpayer, a corporation, assigned a portion of oil and sulphur payment rights to its president in consideration for the cancellation of a debt the corporation owed to the president. The Supreme Court considered the profit to be in essence a substitution for the oil and sulphur payments that the corporation would have otherwise received in the future, and held it taxable as ordinary income for that reason. Id. at 265, 78 S. Ct. at 694.

The Gillette taxpayer owned a motor vehicle facility during World War II, which the government assumed control of and for which it paid just compensation. Gillette, 364 U.S. at 131-32, 80 S. Ct. at 1499. Though the taking involved "property" for purposes of the Fifth Amendment Takings Clause, that fact "[did] not answer the entirely different question whether [the compensation] comes within the capital-gains provisions of the Internal Revenue Code." Id. at 133, 80 S. Ct. at 1500. Indeed, the Supreme Court held the compensation paid to taxpayer taxable as ordinary income. Id. at 136, 80 S. Ct. at 1501. Finally, in Midland-Ross, 381 U.S. 54, 55-56, 85 S. Ct. 1308, 1309, 14 L. Ed. 2d 214 (1965), the taxpayer bought noninterest-bearing promissory notes subject to an original issue discount, and then sold them for more than the issue price but still less than face value. The Supreme Court held that the gains attributable to the original issue

8

discount were taxable as ordinary income, noting the similarity to stated interest.

Id. at 57-58, 85 S. Ct. at 1310. The overall effect of these cases has been to narrow

what a mechanical application of Section 1221 would otherwise cause to be treated

as a capital asset.

With that background, four Circuits have reviewed the precise legal question

we face here under materially identical circumstances.[5] Each Circuit has

concluded that Lottery Rights are substitutes for ordinary income, but came to this

conclusion in different ways. The Ninth Circuit used a case-by-case analysis, but

focused on two factors in particular: that the taxpayer "(1) did not make any

underlying investment of capital in return for the receipt of his lottery right, and

(2) the sale of his right did not reflect an accretion in value over cost to any

underlying asset [he] held." Maginnis, 356 F.3d at 1183. Though the Maginnis

court noted that these factors would not be dispositive in all cases, the Third

Circuit in Lattera, 437 F.3d at 404-09, found the factors problematic, and instead

formulated its own approach, which it termed the "family resemblance" test.

Within the confines of this test, the Third Circuit analyzed the nature of the sale

and the character of the asset, specifically, whether the payment was for the future

---

[5]We note that Taxpayers' initial brief is strikingly similar to that of the appellants in Maginnis. Opening Br. of Maginnis et al., Defs.-Appellants, United States v. Maginnis, No. 02-35664, Feb. 1. 2003. Thus, the Maginnis court confronted, and rejected, largely the same arguments that Taxpayers raise here.

right to *earn* income or for the future right to *earned* income. Id. at 409. The Second and Tenth Circuits did not explicitly adopt the Maginnis reasoning or the Lattera test, but held that "whatever the [substitute for ordinary income] doctrine's outer limits, this case falls squarely within them." Prebola, 482 F.3d at 612; see Watkins, 447 F.3d at 1273 ("[W]e need not formulate any specific test regarding the appropriate limits of the doctrine's application."); Wolman v. Comm'r, 180 Fed. Appx. 830, 831 (10th Cir. 2006) ("For the same reasons stated in Watkins, we reject the Wolmans' argument and hold that the lump sum payments were taxable as ordinary income.").

We agree with our sister circuits that Lottery Rights are a clear case of a substitute for ordinary income. A lottery winner who has *not* sold the right to his winnings to a third party must report the winnings as ordinary income whether the state pays him in a lump sum or in installments. See 26 U.S.C. § 165(d) (describing tax treatment for losses from wagering transactions); Comm'r v. Groetzinger, 480 U.S. 23, 32 & n.11, 107 S. Ct. 980, 986 & n.11, 94 L. Ed. 2d 25 (1987) (describing the lottery as a form of public gambling subject to 26 U.S.C. § 165(d)'s provision regarding wagering losses). Thus, when a lottery winner sells the right to his winnings, he replaces future ordinary income. In defining "capital asset," Congress did not intend for taxpayers to circumvent ordinary income tax treatment by packaging ordinary income payments and selling them to a third

10

party.  See Lake, 356 U.S. at 265, 78 S. Ct. at 694 (illustrating courts' need to protect against "artful devices").

There are important differences between Lottery Rights and the typical capital asset.  The sale of a capital asset captures the increased value of the underlying asset.  Perhaps the most common example occurs when a taxpayer purchases shares of stock, owns the shares for longer than a year, and then sells them at a higher price.  The taxpayer makes an underlying investment in a capital asset when he purchases the stock.  When he sells the shares at a higher price, the gain represents an increase in the value of the original investment.  As the Ninth Circuit noted in Maginnis, 356 F.3d at 1183, Lottery Rights lack these characteristics emblematic of capital assets -- Lottery Rights involve no underlying investment of capital.  Furthermore, any "gain" from their sale reflects no change in the value of the asset.  It is simply the amount Taxpayers would have received eventually, discounted to present value.[6]

---

[6]As they are stated in Maginnis, these factors are obviously imperfect.  For example, relying on the taxpayer's underlying investment ignores legitimate capital assets obtained through gifts or inheritances, and consideration of accretion in value excludes capital assets that typically depreciate, such as cars.  See Lattera, 437 F.3d at 405.  The Maginnis court properly observed that the factors would not be dispositive in every case.  Maginnis, 356 F.3d at 1183.  A court would have no occasion to evaluate these factors where the asset sold is something other than a claim to ordinary income, such as a car.  The factors do, however, serve to emphasize the essence of a capital transaction: "that the sale or exchange of an asset results in a return of a capital investment coupled with realized gain or loss."  Holt v. Comm'r, 303 F.2d 687, 691 (9th Cir. 1962); see also Gillette, 364 U.S. at 134, 80 S. Ct. at 1500 ("This Court has long held that the term 'capital asset' is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a

Furthermore, when a lottery winner sells Lottery Rights, he transfers a right to income that is already earned, not a right to earn income in the future. See Lattera, 437 F.3d at 407-09. The Fifth Circuit long ago drew this distinction in United States v. Dresser Industries, Inc., 324 F.2d 56 (5th Cir. 1963), when it held that proceeds from the grant of an exclusive license to use an oil well surveying patent warranted capital gains treatment. Recognizing the "vast difference between the present sale of the future right to earn income and the present sale of the future right to earned income," id. at 59, the Dresser court noted that an exclusive patent license is property that can produce unknown income in the future, as opposed to property that represents income payments already certain in amount, but to be paid in the future.

A capital asset has the potential to earn income in the future based on the owner's actions in using it. Lottery winners, by contrast, are "entitled to the income merely by virtue of owning the property." Note, Thomas G. Sinclair, Limiting the Substitute-for-Ordinary-Income Doctrine: An Analysis Through Its Most Recent Application Involving the Sale of Future Lottery Rights, 56 S.C. L. Rev. 387, 406 (2004); see Lattera, 437 F.3d at 409-10; Dresser, 324 F.2d at 59. Income need not be accrued for tax purposes to be "earned" in this sense. Cf.

substantial period of time . . . ."). We also note that the tax treatment of gifts, inheritances, and sales of automobiles is well established and neither relevant to nor affected by the issues in this case.

12

Thomas v. United States, 45 F. Supp. 2d 618 (S.D. Ohio 1999), aff'd, 213 F.3d 927 (6th Cir. 2000) (holding that a lottery winner must report income from winnings during the period the payment was received).  Thus, income from a lottery payment is earned income despite the fact that it does not accrue until the scheduled annual payment date.  Proceeds from the sale of Lottery Rights are a clear substitute for ordinary income and are taxable as ordinary income.

     1.     Effect of Arkansas Best

We briefly address Taxpayers' argument that the Supreme Court's decision in Arkansas Best Corp. v. Comm'r, 485 U.S. 212, 108 S. Ct. 971, 99 L. Ed. 2d 183 (1988), significantly limited the substitute for ordinary income doctrine.  Like other courts that have confronted it, we reject this contention.  Maginnis, 356 F.3d at 1185; Lattera, 437 F.3d at 403-04; Davis, 119 T.C. at 6; Gladden v. Comm'r, 112 T.C. 209, 221 (1999), rev'd on other grounds, 262 F.3d 851 (9th Cir. 2001); FNMA v. Comm'r, 100 T.C. 541, 573 & n.30 (1993).

The Arkansas Best Court discussed the substitute for ordinary income doctrine in a footnote.[7]  The footnote reads, in full:

> Petitioner mistakenly relies on cases in which this Court, in *narrowly* applying the general definition of "capital asset," has "construed

---

[7] Ark. Best, 485 U.S. at 216-18, 108 S. Ct. at 974-75, addressed the question of whether the taxpayer's motive in acquiring an asset, either a business motive or an investment motive, determines whether it is a capital asset or an ordinary asset.  The substitute for ordinary income doctrine was not relevant to the decision.

'capital asset' to exclude property representing income items or accretions to the value of a capital asset themselves properly attributable to income," even though these items are property in the broad sense of the word. United States v. Midland-Ross Corp., 381 U.S. 54, 57, 85 S. Ct. 1308, 1310, 14 L. Ed. 2d 214 (1965). See, e.g., Comm'r v. Gillette Motor Co., 364 U.S. 130, 80 S. Ct. 1497, 4 L. Ed. 2d 1617 (1960) ("capital asset" does not include compensation awarded taxpayer that represented fair rental value of its facilities); Comm'r v. P.G. Lake, Inc., 356 U.S. 260, 78 S. Ct. 691, 2 L. Ed. 2d 243 [sic] (1958) ("capital asset" does not include proceeds from sale of oil payment rights); Hort v. Comm'r, 313 U.S. 28, 61 S. Ct. 757, 85 L. Ed. 1168 (1941) ("capital asset" does not include payment to lessor for cancellation of unexpired portion of a lease). This line of cases, based on the premise that § 1221 "property" does not include claims or rights to ordinary income, has no application in the present context. Petitioner sold capital stock, not a claim to ordinary income.

Ark. Best, 485 U.S. at 217 n.5, 108 S. Ct. at 975 n.5 (emphasis added and citation formatting modified). This footnote affirmed that the substitute for ordinary income doctrine applies to "property" that represents a claim to ordinary income.

Taxpayers urge a different interpretation. They focus on the Court's use of the word "narrowly" and insist that the factual scenarios corresponding to the four Supreme Court cases cited in the footnote, Hort, Lake, Gillette, and Midland-Ross, are the only surviving remnants of the substitute for ordinary income doctrine. They argue that because the footnote "directly clashes with the body of the opinion . . . the only logical reading of the use of the term 'narrowly' in footnote 5 is that *only* in those particular '*narrow*' factual situations that existed in the cited cases is the [d]octrine applicable." (Br. for the Appellants 42.)

14

Taxpayers' reading is not the natural one. In the footnote, the word "narrowly" modifies the phrase that immediately follows, "applying the general definition of 'capital asset.'" The footnote unambiguously explains that in the cited cases, the Court applied the *statutory definition* of capital asset narrowly. It in no way implies that the Court applied the *substitute for ordinary income doctrine* narrowly, nor hints that the Court would confine the doctrine to the facts of the cases it cites. To the contrary, the Court cites general language that indicates that it would apply the doctrine in any situation involving "'income items or accretions to the value of a capital asset themselves properly attributable to income.'" Ark. Best, 485 U.S. at 217 n.5, 108 S. Ct. at 975 n.5 (quoting Midland-Ross, 381 U.S. at 57, 85 S. Ct. at 1310). We have no trouble reconciling this footnote with the body of the Arkansas Best opinion for the reasons stated in the footnote itself: the taxpayer in that case "sold capital stock, not a claim to ordinary income." Id. We reject Taxpayers' attempt to limit the substitute for ordinary income doctrine in an unreasonable manner not suggested by the relevant case law.

This is not to say that the substitute for ordinary income doctrine applies upon the sale of *every* asset that produces ordinary income. Taken to its logical extreme, the substitute for ordinary income doctrine would obliterate capital gains treatment altogether because a capital asset's present value is often based on its future ability to produce revenue in the form of ordinary income. Maginnis, 356

15

F.3d at 1182. We acknowledge that the doctrine has its outer limits, but we do not define them here. We merely recognize that Arkansas Best did not circumscribe the substitute for the ordinary income doctrine. See, e.g., Maginnis, 356 F.3d at 1185; Lattera, 437 F.3d at 403-04.

B.      "Property" Under Section 1221

As Taxpayers note, Arkansas Best makes clear that if a given asset is not listed within Section 1221's exclusions, it is a capital asset unless it is not considered "property." Ark. Best, 485 U.S. at 217-18, 108 S. Ct. at 975. The pertinent Treasury Department regulation also provides that "[t]he term capital assets includes all classes of property not specifically excluded by section 1221." 26 C.F.R. § 1.1221-1(a). The parties do not dispute that Lottery Rights are not within the statutory exclusions. Therefore, in deciding that the substitute for ordinary income doctrine applies, we necessarily find that Lottery Rights do not constitute "property" as that term is used in Section 1221. 4 Mertens Law of Federal Income Taxation § 22:4 (Sept. 2007) [hereinafter Mertens] ("In situations where the court determines that the intangible right is a substitute for ordinary income, the court concludes (either implicitly or explicitly) that the asset sold does not constitute property for purposes of Section 1221.").

Taxpayers also note that Lottery Rights are property in the ordinary sense of the term and for purposes of other state and federal laws. We recognize that

16

Lottery Rights are property for most other purposes, but "property" under Section 1221 is a narrower concept. Gillette, 364 U.S. at 134-35, 80 S. Ct. at 1500-01; Mertens, supra, § 22:4 ("The mere fact, however, that the asset in question constitutes 'property' in the broad sense of the word does not mean that such asset constitutes property for purposes of Section 1221 or that the property constitutes a capital asset."); Note, Distinguishing Ordinary Income from Capital Gain Where Rights to Future Income are Sold, 69 Harv. L. Rev. 737, 737-38 (1956) ("'Property,' as it is broadly used in other areas of the law, includes such items as unpaid claims for personal services or for accrued rents. Unless Congress intended that holders of such claims to ordinary income would be able by selling them to transform ordinary income into capital gain, 'property' for the purposes of section 1221 is a more limited concept."). As the Supreme Court has stated, "it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset." Gillette, 364 U.S. at 134, 80 S. Ct. at 1500.[8] The Court again recognized in Arkansas Best that a literal reading of the term "property" is not appropriate where such a reading would include ordinary income and substitutes for ordinary income. See Ark. Best, 485

_____

[8] Taxpayers argue that Gillette's statement about "property" should be confined to the narrow context of that case. Courts applying the substitute for ordinary income doctrine have relied on this statement as a general proposition. E.g., Midland-Ross, 381 U.S. at 56-57, 85 S. Ct. at 1310; Watkins, 447 F.3d at 1271-72.

17

U.S. at 217 n.5, 108 S. Ct. at 975 n.5 (describing the assets falling within the substitute for ordinary income doctrine as "property in the broad sense of the word"); see also Donna D. Adler, A Conversational Approach to Statutory Analysis: Say What You Mean & Mean What You Say, 66 Miss. L.J. 37, 106 (1996) ("If the literal language of [Section 1221] were followed, taxpayers could convert much of their ordinary income to capital gain merely by selling the right to the income before the payment was actually made.").

This interpretation, which courts repeatedly adopt, gives effect to congressional intent. In defining "capital asset," Congress used the term "property" to mean "not income" -- that is, "property" serves to distinguish assets suitable for capital gains treatment from mere income. "Property" in the most general sense means anything owned, which would also include income and any rights or claims to it. Even if other statutes use "property" in this broad sense, to exclude substitutes for income in determining what constitutes a capital asset is consistent with the word "property." No other interpretation of "property" would harmonize with the statute's purpose, as the very nature of the term "capital asset" excludes what is in essence ordinary income. See Stanley S. Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv. L. Rev. 985, 987-88 (1956) ("Since in one sense everything that the taxpayer holds is 'property' and hence will be a capital asset, at this point it would seem to follow that all income could well be

18

'capital gain' . . . ."). Indeed, in applying the substitute for ordinary income doctrine, the Gillette court declined to use the all-inclusive definition of property the Supreme Court espoused in one of its earlier decisions, Crane v. Comm'r, 331 U.S. 1, 6, 67 S. Ct. 1047, 1051, 91 L. Ed. 1301 (1947) (interpreting "property" as anything subject to ownership). Rather, the Gillette court confirmed that some things that would normally be "property" are not capital assets, even if no statutory exclusion covers them. Gillette, 364 U.S. at 134, 80 S. Ct. at 1500. Lottery Rights, as we explained above, are substitutes for ordinary income. We now address two of Taxpayers' arguments related to specific types of property.

### 1. Accounts Receivable

Taxpayers argue that Lottery Rights are property because they are "accounts receivable." Section 1221 excludes from the definition of capital asset certain types of accounts receivable, specifically "accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1)." 26 U.S.C. § 1221(a)(4). The exclusion of business-related accounts receivable, according to Taxpayers, implies that all other types of accounts receivable are property, because otherwise that exclusion would be surplusage.

Taxpayers' primary support for their argument that Lottery Rights are accounts receivable comes from the Uniform Commercial Code, which defines

19

"account" to include rights to payment "as winnings in a lottery or other game of chance operated or sponsored by a State." U.C.C. § 9-102(a)(2). But the *Internal Revenue Code* does not define "accounts receivable." As the Fifth Circuit stated in a case involving contractual rights in a mortgage servicing agency, "[t]he fact that [those rights] constitute a species of 'property' under state law affords no assistance in determining whether such rights are capital assets." Bisbee-Baldwin Corp. v. Tomlinson, 320 F.2d 929, 932 (5th Cir. 1963); see also Miller v. Comm'r, 299 F.2d 706, 708 (2d Cir. 1962) (noting that although ordinary property concepts are relevant, non-tax definitions are "certainly not binding" on a court interpreting Section 1221).

In any event, the status of Lottery Rights as accounts receivable is a separate question from whether Lottery Rights fall under the substitute for ordinary income doctrine. As the Maginnis court stated: "Although some accounts receivable not covered by 1221(a)(4)'s exception will be capital assets, under the substitute for ordinary income doctrine, some will not be capital assets. Assuming without deciding that Maginnis' lottery right was an account receivable, that fact does not affect our analysis." Maginnis, 356 F.3d at 1187 n.9. In other words, even if a certain asset is classified as a non-business-related account receivable, the application of the substitute for ordinary income doctrine is not necessarily

20

precluded, if the asset is otherwise a substitute for ordinary income under the principles of the doctrine.

We acknowledge the merits of Taxpayers' statutory interpretation argument. But in order to effect congressional intent, courts applying the substitute for ordinary income doctrine sometimes reach a different result than they would applying bare interpretive canons without context. See In re Griffith, 206 F.3d 1389, 1393 (11th Cir. 2000) (explaining that canons of construction "'are no more than rules of thumb that help courts determine the meaning of legislation.'") (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253, 112 S. Ct. 1146, 1149, 117 L. Ed. 2d 391 (1992)). The substitute for ordinary income doctrine prioritizes substance over form to eliminate capital gains treatment in situations involving claims for ordinary income. See Lake, 356 U.S. at 266, 78 S. Ct. at 695 ("The substance of what was assigned was the right to receive future income."). Congress did not intend to tax lottery winnings as capital gains. Thus, whether or not Lottery Rights are "accounts receivable," they are not capital assets under Section 1221.[9]

---

[9] This is consistent with Arkansas Best. There, the Court rejected a taxpayer's reading of Section 1221 that would have made surplusage of the statutory exceptions. Ark. Best, 485 U.S. at 218, 108 S. Ct. at 975. The Arkansas Best taxpayer argued that the exceptions in the statute were "illustrative, rather than exhaustive," and suggested that the Court was free to create additional exceptions. Id. at 217, 108 S. Ct. at 975. The court rejected that argument, but distinguished cases in which courts apply the substitute for ordinary income doctrine. Id. at 217 n.5, 108 S. Ct. at 975 n.5. The doctrine's purpose is to narrow the statutory language in order to effect congressional intent. By contrast, where no substitute for ordinary income is involved, Arkansas Best requires a

## 2. Debt Instruments

Finally, we are unpersuaded by Taxpayers' argument that Lottery Rights are "debt instruments" under 26 U.S.C. § 1275. That section defines "debt instrument" as "a bond, debenture, note, or certificate or other evidence of indebtedness." 26 U.S.C. § 1275(a)(1)(A). Taxpayers argue that Lottery Rights are property, and therefore capital assets, because they are "evidence of indebtedness."[10] In confronting the same argument, the Maginnis court cited Deputy v. du Pont, 308 U.S. 488, 498, 60 S. Ct. 363, 368, 84 L. Ed. 416 (1940), in which the Supreme Court stated that "'interest on indebtedness' means compensation for the use or forbearance of money." Maginnis, 356 F.3d at 1187. For example, an individual borrowing money from a bank pays interest to the bank in exchange for having access to the bank's money up front. The Maginnis court stated that a lottery winner "receive[s] his right to payments from the state . . . as a prize, not as any compensation for the use or forbearance of money, and therefore the lottery right

---

broad reading of Section 1221 that would result in capital gains treatment unless one of the listed exceptions applies. Arkansas Best supports an approach in which courts analyze the substitute for ordinary income doctrine somewhat independently of the bare statutory text. See id. at 217 & n.5, 108 S. Ct. at 975 & n.5.

[10] Taxpayers note that assets classified as debt instruments under § 1275 are traditionally capital assets under § 1221, but do not cite any authority for this proposition. We did not locate any cases in which an asset was held to be a capital asset under § 1221 *because* it was a debt instrument under § 1275, and we agree with the Tax Court below that § 1275 is not determinative of capital asset status under § 1221. Womack v. Comm'r, T.C.M. 2006-240, 2006 WL 3208890, at *8 (Nov. 7, 2006). In any event, we accept the Ninth Circuit's interpretation of § 1275 in Maginnis, 356 F.3d at 1187, which excludes Lottery Rights.

22

d[oes] not constitute evidence of an indebtedness from [the state] to [the lottery winner]." Id. We agree. That Lottery Rights are traded in the financial marketplace is irrelevant to an asset's characterization under Section 1275. In determining whether Lottery Rights are evidence of indebtedness, we look to the party allegedly indebted, here the state of Florida. Florida incurred no *debt* when it undertook the obligation to make prize payments to lottery winners. The lottery winners won a game of chance, for which they were awarded a certain amount of money to be paid annually. They lent no money to Florida, and made no promise to Florida to use money, or to refrain from using money. Lottery Rights are thus not evidence of Florida's indebtedness to Taxpayers, nor debt instruments under Section 1275.

## IV.  Conclusion

For the foregoing reasons, we hold that proceeds from the sale of Lottery Rights should be taxed as ordinary income under the substitute for ordinary income doctrine. The Tax Court's decision is **AFFIRMED**.

23