William T. GLADDEN; Nicole L. Gladden, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 00–70081.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 2001

Filed Aug. 20, 2001

Burgess J. Raby, Tempe, Arizona, for the petitioners-appellants.

Patricia Bowman, U.S. Department of Justice, Washington, D.C., for the respondent-appellee.

Before: BEEZER, O'SCANNLAIN and W. FLETCHER, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge:

William and Nicole Gladden ("the Gladdens") appeal the Tax Court's ruling that they cannot allocate any of their cost basis in farmland to the sale of water rights appurtenant to the land. The Tax Court held that the Gladdens acquired the water rights in a "separate transaction" that occurred after the original land purchase, and that the cost basis of the rights was therefore zero. We reverse and remand.

I

The Gladdens are 50% partners in the Saddle Mountain Ranch partnership ("the partnership"), which farms 880 acres of land in the Harquahala Valley in Arizona. The partnership purchased the land in 1976 for $675,000. At the time of purchase, the land had no appurtenant water rights, but was within the boundaries of the Harquahala Valley Irrigation District ("HID"), an Arizona municipal corporation formed in 1964 to acquire water rights and distribute irrigation water in the area. In 1968, Congress had approved the Colorado River Basin Project Act, Pub.L. No. 90–537, which authorized construction of the Central Arizona Project ("CAP") to bring water from the Colorado River to, among other places, the Harquahala Valley. The Act provided that project water "shall not be made available directly or indirectly for the irrigation of lands not having a recent irrigation history as determined by the Secretary." *Id.* § 304(a) (codified at 43 U.S.C. § 1524(a)). The partnership's land was eligible to receive CAP irrigation water because it had a "recent irrigation history" when it was purchased. In 1983,

HID obtained the right to take Colorado River water for redistribution within its boundaries, and the partnership in turn obtained water rights from HID. Landowners within HID initially were not allowed to sell these water rights except as part of a sale of the land to which they were appurtenant. Ten years later, however, the federal government entered into an agreement with HID allowing these landowners to sell their water rights to the government without an accompanying sale of the land. The partnership took advantage of this agreement and sold its water rights for $1,088,132. The Gladdens' share of the sale price was $543,566. In their 1993 tax return, the Gladdens listed this amount as a capital gain. They offset this gain by the portion of the original purchase price for the land that they claimed was paid for the expectation of water rights. The Gladdens' calculation led to a reported taxable capital gain of $130,762.

The Commissioner disagreed with the Gladdens. She determined that the Gladdens' share of the sale of the water rights was properly characterized as a $543,566 receipt of ordinary income, with no offset for any price paid for an expectancy in the water rights. She issued the Gladdens a $110,809 notice of deficiency. The Gladdens petitioned for review in Tax Court. They contended that the water rights were a capital asset; that there had been a "sale or exchange" within the meaning of the Tax Code; that it was proper to allocate some portion of their tax basis in the land to the sale of the water rights; and that, because it was impossible to determine what portion of the basis should be allocated to the water rights, capital gain from the sale of the water rights should not be recognized until all of the cost basis in the land had been recovered.

The Tax Court granted summary judgment to the Gladdens on the first two issues, holding that the water rights were

a capital asset and that the rights had been sold or exchanged within the meaning of the Tax Code. However, it granted summary judgment to the Commissioner on the third issue, holding that the Gladdens could not apply any of their tax basis in the land to the sale of water rights because the partnership had purchased the land before acquiring those rights. Because of its holding on the third issue, the Tax Court found it unnecessary to reach the last issue.

 We review the Tax Court's decision under the same standard as a district court's grant of summary judgment. Viewing the evidence in the light most favorable to the non-moving party, we examine de novo whether there was a material issue of fact remaining for trial. *See Ball, Ball & Brosamer, Inc. v. Comm'r,* 964 F.2d 890, 891 (9th Cir.1992). We review the Tax Court's conclusions of law de novo. *Estate of Rapp v. Comm'r,* 140 F.3d 1211, 1215 (9th Cir.1998).

## II

 The controlling issue in this case is whether any of the cost basis in the land purchased by the partnership in 1976 can be allocated to water rights that were expected but not legally vested at the time of the land purchase. We begin our analysis with 26 C.F.R. § 1.61–6(a), which provides:

> When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part.

This regulation tells us that when property is acquired in a lump-sum purchase but then divided and sold off in parts, the cost basis of the property should generally be allocated over the several parts. For example, when a developer subdivides a large tract of land and sells the smaller parcels, he must allocate his cost basis in the overall property among the smaller parcels in order to calculate his gain or loss on the sales of those parcels. *See, e.g., Homes by Ayres v. Comm'r,* 795 F.2d 832, 835 (9th Cir.1986).

Section 1.61–6(a) would be easy to apply to this case if the water rights had already been vested when the partnership had purchased the land. If this had been true, the facts would closely resemble those of *Inaja Land Co., Ltd. v. Comm'r,* 9 T.C. 727, 1947 WL 89 (1947), where the Tax Court applied the principle that was later codified in § 1.61–6(a). The city of Los Angeles had paid the taxpayer in *Inaja Land* $50,000 for a contract allowing the city to flood his land, and the taxpayer wished to assign some portion of the payment to recovery of his cost basis in the land. The Commissioner argued that he could not do so because the gain was ordinary income. The Tax Court disagreed, describing the transaction as the sale of an easement for a capital gain, and stating that "where property is acquired for a lump sum and subsequently disposed of a portion at a time, there must be an allocation of the cost or other basis over the several units and gain or loss computed on the disposition of each part." *Id.* at 735 (citing *Blum v. Comm'r,* 5 T.C. 702, 709, 1945 WL 63 (1945)); *see also Day v. Comm'r,* 54 T.C. 1417, 1427, 1970 WL 2201 (1970) (noting that groundwater rights appurtenant to land "very substantially affected the value of [the] land" and treating revenue from sale of rights as capital gain); Rev. Rul. 66–58, 1966–1 C.B. 186 (cost basis of land and cotton allotment purchased together should be equitably apportioned in accordance with fair market value at time of purchase).[1]

---

1. Revenue rulings "constitute a body of experienced and informed judgment to which

Section 1.61–6(a) would also be easy to apply if the partnership had purchased the property with no expectation that it would ever be able to acquire Colorado River water rights. If this were the case, we could be sure that none of the original cost of the land was attributable to the water rights, or to any expectancy of water rights. It would obviously be improper in such a case to allow the partnership to allocate any of the cost of their original land purchase to the sale of the later-acquired rights. *See Plow Realty Co. v. Comm'r*, 4 T.C. 600, 609, 1945 WL 140 (1945) (where land was originally valued solely for cattle grazing qualities, subsequent sale of mineral rights had cost basis of zero); Rev. Rul. 66–58, 1966–1 C.B. 186 (taxpayer could not allocate cost basis in land to sale of cotton allotment acquired after land purchase and sold separately from land).

However, the Gladdens' case falls between the two easy cases. The water rights were not vested at the time the partnership purchased its land, but the purchase was made with a realistic expectation that water rights would eventually attach to the land. The Tax Court held that since the water rights were not vested when the land was purchased, they were acquired in a "separate transaction" from the land purchase for purposes of determining their tax basis. Because the water rights were acquired at no cost, the Gladdens therefore had zero cost basis in them. The Tax Court's theory would create a bright-line rule under which a taxpayer could never apportion any of his cost basis in land to the sale of an appurtenant water right that was not fully vested in the land at the time of purchase, even though in practical economic terms that expectation had a real value at the time of purchase.

The Tax Court's rule appears to us to be unsound. First, it would produce odd economic consequences. Where land is purchased at a premium based on the expectation of a future water right, separating the land and water rights for the purposes of allocating basis would cause the land to have an artificially high basis and the water rights to have an artificially non-existent basis. To illustrate, suppose Greenacre and Brownacre are two parcels of land that are identical except for the fact that Greenacre is almost certain to receive (but has not yet received) federally subsidized water rights, while Brownacre will almost certainly remain parched. As a result, Brownacre sells for $500 per acre, while Greenacre sells for $1000. Assume that each parcel is purchased by a separate taxpayer, and that *both* eventually receive water rights. Then both taxpayers sell their water rights for $500 in one year and their land for $500 a year later. Under the Tax Court's ruling, the owner of Brownacre would report a $500 capital gain in the first year and no gain or loss in the second, which reflects economic reality. But the owner of Greenacre would report a $500 capital gain the first year, and a $500 loss in the next, when in fact neither occurred.

Second, the Tax Court's rule may conflict with existing precedent. In *Piper v. Comm'r*, 5 T.C. 1104, 1945 WL 103 (1945), a taxpayer had previously traded securities in one company for common stock and common stock subscription warrants in another company. When the taxpayer sold the common stock (including stock subsequently obtained by exercising the warrants), he was allowed to attribute some of his original basis to the warrants. In the words of the court, "[i]t can not be said

courts may properly resort for guidance." *Lucky Stores v. Comm'r*, 153 F.3d 964, 966 n. 4 (9th Cir.1998) (quoting *Watts v. United States*, 703 F.2d 346, 350 n. 19 (9th Cir. 1983)).

that the warrants had no value simply because they could not be exercised to immediate financial advantage at the time they were issued.... [T]he fact that [the warrants] were highly speculative and entirely prospective is no basis ... for denying to them any value." *Id.* at 1110.

Finally, we draw support from Revenue Ruling 86–24, 1986–1 C.B. 80. There, a farmer purchased ten cows that had been artificially impregnated with transplanted embryos. The fair market value of the cows before their impregnation was "80x dollars" but the farmer paid "250x dollars" for them. After the cows gave birth, the farmer sold them (but kept their calves), this time for $80x. The IRS ruled that the farmer would not recognize any gain or loss on the sale of the cows; of the $250x purchase price, only $80x was properly allocated to basis in the cows themselves. According to the IRS, the remaining $170x that the farmer paid was the price of the embryos, and that amount was therefore properly treated as the farmer's basis in those embryos. This result mirrors the one we reach here; the farmer's basis in the calves was the premium he paid for the cows based on his expectation that they would give birth. *Cf. Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919, 922 (1887) (breeding cows more valuable than barren cows).

■ For the foregoing reasons, we believe that the Gladdens may apportion some of their cost basis in the land to the later sale of water rights appurtenant to that land. More precisely, we hold that where a purchaser pays a premium for land based on a realistic expectation that water rights will attach to that land in the future, the purchaser may, upon sale of the later-acquired water rights, claim a cost basis equal to the premium paid.

The IRS has not cited any cases that contradict our holding. Its brief relies principally on *Niagara Mohawk Power Corp. v. United States*, 207 Ct.Cl. 576, 525 F.2d 1380 (1975), where the Court of Claims held that a company that acquired water rights through a merger with another company could not use as its cost basis the fair market value of those rights at the time of acquisition. *See id.* at 1389–90. Instead, the court determined that the proper basis for the rights was the actual cost of their acquisition, measured by the value of securities exchanged to obtain them. We believe that *Niagara Mohawk* is consistent, rather than inconsistent with our rule, for the value attached to the water rights in that case was the price actually paid for them. In the case before us, the IRS argues that the water rights came to the partnership at no cost, and that they therefore have a basis of zero. But this argument evades the question by assuming the answer. If the partnership paid a premium for its land, it did so because the land was expected to receive water rights, just as the cows in Rev. Rul. 86–24 were expected to produce calves. One expectation was less sure than the other, but both were reasonable.

### III

■ Having determined that the Gladdens may apply some portion of the cost basis of the partnership's land purchase to the sale of its water rights, the question then becomes how much may be applied. *Inaja Land* guides us again. After determining that the taxpayer in that case was entitled to allocate some portion of the cost basis of the property to the sale of the easement, the Tax Court recognized the difficulty of determining the appropriate basis with precision. *See* 9 T.C. at 735. Noting the general rule that taxpayers "should not be charged with gain on pure conjecture unsupported by any foundation of ascertainable fact," *id.* at 736 (citing *Burnet v. Logan*, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931)), the Tax Court

856

held that where it is "impossible or impractical" to apportion basis among several portions of a property, a taxpayer need not recognize any capital gain until the entire cost basis of the property has been recovered. *Id.* at 736.

The Gladdens contend that, under *Inaja Land*, it is impossible or impractical to apportion a definite basis to the water rights, and that they are therefore entitled to recover their entire cost basis in the land before reporting any capital gain from the sale. *See id.* at 736. We are not so sure. For example, it may be possible to determine the premium price paid for the potential water rights by comparing the price of the land purchased by the partnership to prices of similar land without a "recent history of irrigation" and therefore without any expectation of water rights. The difference between these prices would be the premium paid for the expectation of future water rights.

However, because the Tax Court ruled against the Gladdens on summary judgment, the record is undeveloped. We cannot determine, based on the record now before us, either what portion of the cost of the land may have been a premium paid for the water rights later acquired by the partnership, or whether it is "impracticable or impossible" to determine what that premium may have been.

We therefore REVERSE and REMAND for further proceedings consistent with this opinion.