GEORGE H. TEMPEL AND GEORGETTA TEMPEL, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 23689–08.          Filed April 5, 2011.

In 2004 Ps donated a qualified conservation easement to a qualified charitable organization. As a result, Ps received conservation easement income tax credits from the State of Colorado. These credits were transferable to other taxpayers. That same year Ps sold a portion of those credits. Ps reported short-term capital gains from the sales of the State credits. Ps claimed an allocated portion of the professional fees they incurred to complete the conservation easement donation, as adjusted basis in the State tax credits they sold. R determined the State income tax credits that Ps sold were not capital assets and that Ps had no adjusted basis in the credits. R filed a motion for partial summary judgment and Ps filed a cross-motion. In their cross-motion, Ps also claim that proceeds from their sales of State tax credits should have been reported as long-term capital gains. *Held*: The State tax credits Ps sold are capital assets. *Held*, *further*, Ps do not have any basis in their State tax credits. *Held*, *further*, Ps' holding period in their State tax credits is insufficient to qualify for long-term capital gains treatment.

*James R. Walker* and *Christopher D. Freeman*, for petitioners.

*Tamara L. Kotzker* and *Sara J. Barkley*, for respondent.

OPINION

WHERRY, *Judge*: This case involves a petition for redetermination of income tax deficiencies determined by

respondent for petitioners' 2004 and 2005 tax years. It is before the Court on respondent's August 3, 2009, motion for partial summary judgment and petitioners' August 31, 2009, cross-motion for partial summary judgment. See Rule 121(a). [1] Respondent argues that petitioners' gains from sales of their transferable Colorado income tax credits (State tax credits) are not capital gains and instead should be taxed as ordinary income. Respondent also argues in the alternative that petitioners do not have any basis in their State tax credits.

Petitioners filed a cross-motion for partial summary judgment in which they agree that summary judgment is appropriate. Petitioners claim that their gains from the sales of their State tax credits, reported as short-term capital gains, should have been reported as long-term capital gains. They also assert they are entitled to reduce those gains by their allocable basis in the credits they sold. For the reasons discussed below, we agree with petitioners that the transferable State tax credits at issue are capital assets, and we agree with respondent that petitioners had neither basis, nor a long-term holding period, in their State tax credits.

## *Background*

On December 17, 2004, petitioners, George and Georgetta Tempel, husband and wife, donated a qualified conservation easement to the Greenlands Reserve, a qualified organization, on approximately 54 acres of petitioners' land in Colorado. Petitioners claimed the fair market value of their donation was $836,500. They incurred $11,574.74 of expenses in connection with the donation that primarily consisted of various professional fees. As a result of the donation petitioners received $260,000 of conservation easement income tax credits from the State of Colorado.

Throughout 2004 Colorado granted its eligible residents income tax credits for donating perpetual conservation easements. Colo. Rev. Stat. sec. 39–22–522 (2010). For 2004 the State granted an income tax credit equal to 100 percent of the value of such a donation up to $100,000. *Id.* sec. 39–22–

---

[1] Rule references are to the Tax Court Rules of Practice and Procedure. Unless otherwise noted, section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the tax years at issue.

522(4)(a)(I). To the extent a donation's value exceeded $100,000, additional credit was limited to 40 percent of the value in excess of $100,000. *Id.* The maximum allowable credit was $260,000 for each donation. *Id.*

Colorado allowed conservation easement credit recipients to use their credits to receive a limited refund provided that the State had exceeded constitutional tax collection limits commonly known as "Amendment 1" or the "Douglas Bruce Amendment" establishing the taxpayer bill of rights ("TABOR"). *Id.* sec. 39–22–522(5)(b). The refund in certain circumstances could reach a maximum of $50,000. *Id.* Unused credits could be carried forward for up to 20 tax years or transferred to certain eligible taxpayers. *Id.* sec. 39–22–522(5)(a), (7). Transferees may use their credits only to offset a tax liability. *Id.* sec. 39–22–522(7). Transferees are ineligible for a refund and may not transfer their credits. *Id.*

On December 22, 2004, with the assistance of brokers, petitioners sold $40,500 of their State tax credits to an unrelated third party for net proceeds of $30,375.[2] On December 31, 2004, with the assistance of brokers, petitioners sold an additional $69,500 of their credits to another unrelated third party for net proceeds of $52,125.[3] On December 31, 2004, petitioners gave away $10,000 of their credits.

On their 2004 Form 1040, U.S. Individual Income Tax Return, petitioners reported $77,603 of short-term capital gains from the sale of their State tax credits. Schedule D, Capital Gains and Losses, of their 2004 tax return reflects total proceeds from the sales of the State tax credits of $82,500 and a basis of $4,897 in those credits. Petitioners reported their basis in the State tax credits by allocating the $11,574.74 of expenses they incurred to make the donation to the portion of the credits they sold (i.e., $110,000 of credits sold/$260,000 of total credits × $11,574.74 = $4,897).

On June 26, 2008, respondent issued a notice of deficiency to petitioners for their 2004 and 2005 tax years. Respondent determined petitioners owed additional tax and penalties partially arising from respondent's adjustments to petitioners' reported gains from the sales of the State tax credits. Respondent concluded that petitioners did not have any basis

[2] The proceeds are net of $4,050 paid to the brokers.

[3] The proceeds are net of $6,950 paid to the brokers.

in their State tax credits and that the gains were ordinary rather than capital.

Petitioners timely petitioned this Court. At the time the petition was filed, petitioners resided in Colorado. Respondent moved for partial summary judgment. Petitioners also moved for partial summary judgment.

## *Discussion*

Respondent's motion for partial summary judgment and petitioners' cross-motion dispute (i) whether petitioners' State tax credits were capital assets, (ii) whether the sales resulted in long-term or short-term capital gains, and (iii) the amount of basis, if any, petitioners had in those credits. Respondent contends and petitioners do not contend otherwise that petitioners' receipt of State tax credits as a result of their conservation easement contribution was neither a sale or exchange of the easement nor a quid pro quo transaction. For our discussion we accept those deemed concessions.

## A. *Summary Judgment*

Rule 121(a) allows a party to move "for a summary adjudication in the moving party's favor upon all or any part of the legal issues in controversy." Summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b). Facts are viewed in the light most favorable to the nonmoving party. *Dahlstrom v. Commissioner*, 85 T.C. 812, 821 (1985).

The moving party bears the burden of demonstrating that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). The Court has considered the pleadings and other materials of record and concludes that as to the points of law at issue here there is no genuine issue of material fact. Whether petitioners' transferable State tax credits are capital assets and what basis, if any, and the holding period petitioners have in their State tax credits are novel

legal questions appropriate for decision by summary judgment.

## B. *Character of Gain*

Capital gains are derived from the sale or exchange of capital assets. Sec. 1222. Section 1221 defines "capital asset" as property[4] held by a taxpayer, except for eight categories of property specifically excluded from the definition.[5] None of the excluded categories is applicable to the State tax credits at issue.[6]

The purpose of capital gains treatment is to provide some relief to taxpayers from the excessive burdens of taxation of an entire gain in 1 year in those instances "typically involving the realization of appreciation in value accrued over a substantial period of time". *Commissioner v. Gillette*

---

[4] Respondent does not challenge that the State tax credits at issue here are property. See also *Va. Historic Tax Credit Fund 2001 LP v. Commissioner*, 639 F.3d 129 (4th Cir. 2011) (concluding that nontransferable State tax credits were property), revg. and remanding T.C. Memo. 2009–295.

[5] Sec. 1221(a) provides in part as follows:

SEC. 1221. CAPITAL ASSET DEFINED.

(a) IN GENERAL.—For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by—

  *   *   *   *   *   *   *

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1);

(5) a publication of the United States Government (including the Congressional Record) which is received from the United States Government or any agency thereof, other than by purchase at the price at which it is offered for sale to the public, and which is held by—

  *   *   *   *   *   *   *

(6) any commodities derivative financial instrument held by a commodities derivatives dealer, unless—

  *   *   *   *   *   *   *

(7) any hedging transaction which is clearly identified as such before the close of the day on which it was acquired, originated, or entered into (or such other time as the Secretary may by regulations prescribe); or

(8) supplies of a type regularly used or consumed by the taxpayer in the ordinary course of a trade or business of the taxpayer.

[6] Respondent concedes that none of the eight categories delineated in sec. 1221(a) is applicable to the State tax credits. Neither party asserts the State tax credits petitioners sold properly come within any other Internal Revenue Code section determining the character of assets; e.g., sec. 1253 (specifying the character of franchises, trademarks, and trade names).

*Motor Transp., Inc.*, 364 U.S. 130, 134 (1960). Capital gains treatment also alleviates the pernicious effects of inflation which creates phantom profits and mitigates the deterrent effect taxation may have on a taxpayer's decision to convert assets that have appreciated. *Burnet v. Harmel*, 287 U.S. 103, 106 (1932); *Snowa v. Commissioner*, 123 F.3d 190, 193 (4th Cir. 1997). However, it has also been acknowledged that section 1221 makes no mention of these judicially perceived motivations for capital asset treatment. *Commissioner v. Ferrer*, 304 F.2d 125, 133 (2d Cir. 1962), revg. and remanding 35 T.C. 617 (1961).

There is "no single definitive" definition of a capital asset. *Gladden v. Commissioner*, 112 T.C. 209, 218 (1999), revd. on a different issue 262 F.3d 851 (9th Cir. 2001). Instead, it is a very broad term. As the Supreme Court observed:

The body of § 1221 establishes a general definition of the term "capital asset," and the phrase "does not include" takes out of that broad definition only the classes of property that are specifically mentioned. * * * [*Ark. Best Corp. v. Commissioner*, 485 U.S. 212, 218 (1988).]

While Congress created a definition of capital asset under section 1221 that is inherently expansive, many courts, including the Supreme Court, have recognized that the term is not without limits beyond those imposed by statute. *Commissioner v. Gillette Motor Transp., Inc.*, *supra* at 135; *Womack v. Commissioner*, 510 F.3d 1295, 1299 (11th Cir. 2007), affg. T.C. Memo. 2006–240; *Watkins v. Commissioner*, 447 F.3d 1269, 1271 (10th Cir. 2006), affg. T.C. Memo. 2004–244; *Gladden v. Commissioner*, *supra* at 218–220.

Faced with determining the character of assets that do not fit any of the section 1221 exceptions to the definition of a capital asset yet do not appear to properly fit that of a capital asset, courts use the substitute for ordinary income doctrine to exclude certain property. See *Lattera v. Commissioner*, 437 F.3d 399, 402–403 (3d Cir. 2006), affg. T.C. Memo. 2004–216. Under this doctrine, "capital asset" does not include mere rights to receive ordinary income. *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 265–266 (1958).

The practical effect of the substitute for ordinary income doctrine is that the Supreme Court "has consistently construed 'capital asset' to exclude property representing income items or accretions to the value of a capital asset themselves

properly attributable to income." *United States v. Midland-Ross Corp.*, 381 U.S. 54, 57 (1965). The doctrine has been applied by courts directly and indirectly to exclude a variety of assets from the breadth of section 1221.[7] As we explained in *Foy v. Commissioner*, 84 T.C. 50, 66 (1985), the substitute for ordinary income doctrine is an important court-imposed limitation on the types of property that will qualify as a capital asset.[8] It is now clear that the substitute for ordinary income doctrine is the only recognized judicial limit to the broad terms of section 1221. See *Ark. Best Corp. v. Commissioner*, *supra* at 217 n.5. Consequently, when determining whether property is a capital asset under section 1221, unless one of the eight exceptions or the substitute for ordinary income doctrine applies it is a capital asset.

---

[7] See, e.g., *Watkins v. Commissioner*, 447 F.3d 1269, 1273 (10th Cir. 2006) (treating the transfer of rights to lottery payments as ordinary income), affg. T.C. Memo. 2004–244; *Saviano v. Commissioner*, 765 F.2d 643, 653–654 (7th Cir. 1985) (holding that the sale of a "gold option" did not result in capital gains when the option represented a right of first refusal to net profits from mining), affg. 80 T.C. 955 (1983); *Freese v. United States*, 455 F.2d 1146, 1152 (10th Cir. 1972) (determining that a settlement payment was a substitute for the taxpayer's services as an employee); *Hallcraft Homes, Inc. v. Commissioner*, 336 F.2d 701, 705 (9th Cir. 1964) (finding sale of water refund agreements resulted in ordinary income), affg. 40 T.C. 199 (1963); *Bisbee-Baldwin Corp. v. Tomlinson*, 320 F.2d 929, 936 (5th Cir. 1963) (treating consideration for mortgage servicing contracts as a substitute for commissions); *Dyer v. Commissioner*, 294 F.2d 123, 126 (10th Cir. 1961) (finding sale of fractional interests in mineral leaseholds was a substitute for future income), affg. 34 T.C. 513 (1960); *Forrer v. Commissioner*, T.C. Memo. 1981–418 (concluding that assignment of rights to book royalties was a transfer of an ordinary income asset).

[8] In *Foy v. Commissioner*, 84 T.C. 50, 65–66 (1985), the Court acknowledged that there were two court-imposed limitations on what type of property qualifies for capital asset treatment, the first being for assets that were held as an integral part of a taxpayer's business as explained by the Supreme Court in *Corn Prods. Ref. Co. v. Commissioner*, 350 U.S. 46, 51 (1955), and the second being assets that were substitutes for ordinary income. Since our decision in *Foy*, the Supreme Court has clarified that there is no separate rule for assets that are an integral part of a taxpayer's business. *Ark. Best Corp. v. Commissioner*, 485 U.S. 212, 217, 221 (1988). Accordingly, there remains only one court-imposed limitation on what type of property qualifies for capital asset treatment. See *FNMA v. Commissioner*, 100 T.C. 541, 573 (1993).

We further acknowledged in *Foy* that after the ordinary income limitation was squarely established by the Supreme Court in *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260 (1958), "subsequent decisions have attempted to clarify" this limitation. *Foy v. Commissioner*, *supra* at 66. We then reviewed the cases subsequent to *P.G. Lake* that have analyzed whether a transfer of a contractual right constituted more than a mere right to receive income. These cases applied the substitute for ordinary income doctrine to the transfer of contractual rights by analyzing the "entire economics of a transaction." *Id.* at 67. We noted there are typically six factors courts will consider to determine whether the substitute for ordinary income doctrine applies. Therefore, the six-factor test originated and has been used as a means of determining the character of gain or loss on the transfer of contractual rights that possess an element of income where those rights may represent more than a mere right to income. Accordingly, there must be contractual rights at issue that convey rights to income in order for the factors specified in *Gladden v. Commissioner*, 112 T.C. 209 (1999), revd. on a different issue 262 F.3d 851 (9th Cir. 2001), to become the appropriate analysis to apply.

### 1. *Inapplicability of Gladden v. Commissioner*

Respondent asserts that the appropriate framework for determining the character of petitioners' gains is the analysis the Court employed in *Gladden v. Commissioner*, *supra*.[9] The taxpayers in *Gladden* agreed to relinquish intangible water rights in exchange for cash. The Court applied contract analysis, specifically a six-factor test (*Gladden* factors),[10] to determine the character of the taxpayers' gain on the relinquishment of those rights. *Id.* at 221. Respondent argues the *Gladden* factors point to ordinary income treatment for the proceeds of the State tax credit sales.

We find that respondent's argument extends the *Gladden* analysis beyond its historical use and the purpose it serves. The *Gladden* factors arose from a judicial need to analyze the underlying nature of contract rights. This Court cannot conclude that a government-granted tax credit is a contract right. There is nothing in the Colorado statutes granting the tax credits that could be understood to create a contract. As the Supreme Court stated in *Natl. R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe R. Co.*, 470 U.S. 451, 465–466 (1985):

For many decades this Court has maintained that absent some clear indication that the legislature intends to bind itself contractually, the presumption is that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, "'[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.'" Thus, the party asserting the creation of a contract must overcome this well-founded presumption, and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation. [Citations omitted.]

---

[9] The analysis was first discussed and applied by the Court in *Foy v. Commissioner*, *supra* at 65–70.

[10] Despite the factors' origination in *Foy v. Commissioner*, *supra*, for convenience to the parties we refer to the analysis as the *Gladden* factors.

Here there is no clear indication that the Colorado legislature intended to bind itself contractually. The presumption that Colorado's State tax credit has not created any private contractual rights has not been overcome.

State tax credits, as respondent concedes, are not contract rights. Respondent has asserted no reason, nor can we think of one, to expand the applicability of the *Gladden* analysis to the State tax credits at issue.

### 2. *Inapplicability of the Substitute for Ordinary Income Doctrine*

Respondent also asserts that petitioners' gains from the sales of their State tax credits are ordinary because they are merely a substitute for ordinary income. First, respondent asserts that petitioners' proceeds from selling the State tax credits are merely a substitute for a refund from Colorado that would have been ordinary income. Respondent's argument assumes that a refundable credit would not be excluded from income. [11] Consequently, respondent's position is that the proceeds petitioners received from the sales of their credits are a substitute for the up to $50,000 tax refund that a Colorado taxpayer could receive in a year the State incurs a budget surplus. [12] Yet respondent also concedes that there was no opportunity for a refund from the State either during 2004 (the year petitioners sold their credits) or in 2006 through 2010. [13]

Petitioners sold $110,000 and gave away $10,000 of their $260,000 of State tax credits, leaving them with $140,000 of State tax credits to use. There is no evidence and respondent does not assert that petitioners sold credits they could have

---

[11] Respondent's motion for summary judgment states that "Generally, a payment from a state attributable to the portion of a refundable credit that exceeds a taxpayer's liability would be ordinary income". As support respondent cites Rev. Rul. 85–39, 1985–1 C.B. 21, amplified by Rev. Rul. 90–56, 1990–2 C.B. 102. Neither revenue ruling addresses the Federal income tax implications of a State tax refund attributable to State tax credits. Instead, the revenue rulings analyze whether distributions from the State of Alaska's annual resident dividend program are income or gifts to the State's residents. Respondent does not provide any reason Colorado's refundable tax credit program should be treated similarly for Federal tax purposes to Alaska's dividend program rather than to the tax and deemed refund programs implemented by the States of Iowa and California. See Rev. Rul. 79–315, 1979–2 C.B. 27 and Rev. Rul. 70–86, 1970–1 C.B. 23, respectively.

[12] A transferee of the State tax credits is never eligible for a refund. Colo. Rev. Stat. sec. 39–22–522(7)(c).

[13] Colorado taxpayers have been able to receive a refund for their conservation easement credits only in 2005.

otherwise used to receive a refund. Therefore, petitioners' proceeds from the sale of their credits are not a substitute for a tax refund.

Second, respondent maintains that to the extent a taxpayer could use a credit to reduce a State tax liability but instead sells that credit, that taxpayer has the economic equivalent of ordinary income. Respondent appears to reason that if an individual taxpayer who sells credits itemizes deductions (ignoring phase-outs), that taxpayer's section 164 Federal income tax deduction is greater than it would have been had that taxpayer retained and used the credits. Therefore, the taxpayer who sells credits has more Federal income tax deductions and owes less Federal income tax. Assuming arguendo that petitioners sold credits that they could some day have used to offset a State tax liability and that they could have deducted that liability for Federal tax purposes were it not offset, respondent's argument still fails. A reduction in a tax liability is not an accession to wealth. Consequently, a taxpayer who has more section 164 deductions has not received any income. [14]

Having addressed respondent's arguments and finding them unpersuasive, we turn to whether there is any reason the substitute for ordinary income doctrine is applicable to the sales of petitioners' State tax credits. The parties and this Court agree that the receipt of a State tax credit is not an accession to wealth that results in income under section 61. See *Browning v. Commissioner*, 109 T.C. 303, 324–325 (1997); Rev. Rul. 79–315, 1979–2 C.B 27. We know of no authority, and respondent has not cited any, for the proposition that a State income tax credit results in ordinary income upon its later sale. [15] On the contrary, courts and the Commissioner's rulings frequently treat government-granted rights as capital assets. [16]

---

[14] Even respondent recognizes that a reduction in taxes does not create income. "The end result of the Act is the issuance by the State of cash payments to all individual income taxpayers. Thus, the Act is merely a means of effecting a statutory decrease in the tax liability of each individual taxpayer". See Rev. Rul. 79–315, 1979–2 C.B. at 27.

[15] Carrying this proposition through to its logical conclusion would mean that inherited and gifted property, also typically received tax free, should receive ordinary income treatment when sold. See *Lattera v. Commissioner*, 437 F.3d 399, 405 (3d Cir. 2006) (discussing a similarly illogical result where a taxpayer has not made any underlying investment in an asset), affg. T.C. Memo. 2004–216.

[16] See *Caboara v. Commissioner*, T.C. Memo. 1977–355 (deciding a liquor license is a capital asset); *Curtis v. United States*, 72–1 USTC par. 9330, 29 AFTR 2d 72–924 (W.D. Wash. 1972) (accepting the parties' characterization of government-allotted milk base rights as capital assets

It is also apparent that the transferred State tax credits never represented a right to receive income from the State. Instead, they merely represented the right to reduce a taxpayer's State tax liability. It is without question that a government's decision to tax one taxpayer at a lower rate than another taxpayer is not income to the taxpayer who pays lower taxes. A lesser tax detriment to a taxpayer is not an accession to wealth and therefore does not give rise to income. [17]

It follows that the taxpayer who is able to claim a deduction or credit has no more income by virtue of having that right than the taxpayer who is unable to make such a claim. [18] Had petitioners used all of their credits to offset their State tax liability, rather than selling them, it appears that respondent would agree there would have been no income to petitioners. [19] Using a tax credit to offset a tax liability is not an accession to wealth.

Petitioners never possessed a right to income from the receipt of the credits. They did not sell a right either to

---

and deciding whether those rights were long-term or short-term capital assets); Rev. Rul. 70–644, 1970–2 C.B. 167 (treating milk allocation rights as capital assets); Rev. Rul. 70–248, 1970–1 C.B. 172 (treating liquor business license as a capital asset); Rev. Rul. 66–58, 1966–1 C.B. 186 (treating a cotton acreage allotments as capital assets). Sec. 197 as contended by regulations may have the effect of characterizing certain intangibles used in a trade or business as sec. 1231 assets. Sec. 197(f)(7); sec. 1.197–2(g)(8), Income Tax Regs.

[17] All "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion" are income. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955).

Some commentators have suggested a State's grant of State income tax credits to taxpayers who make charitable donations of qualified conservation easements should be treated as a transaction that is in part a sale and in part a gift. The Commissioner has eschewed this approach, and neither party has advocated it here. See Chief Counsel Advice 201105010 (Feb. 4, 2011); see also *Browning v. Commissioner*, 109 T.C. 303 (1997).

We discern no reason to disturb this practice. Credits do not increase a donor's wealth, as long as they are used to offset or reduce the donor's own State tax responsibility. A reduced tax is not an accession to wealth. It is only, as occurred in the instant case, when the donor sells or exchanges a State tax credit to a third party for consideration that an accession to wealth has occurred. A lower tax is not the same as or comparable with the State of Alaska's distribution of oil revenues, derived from third parties, to its residents, which was treated as income to them in Rev. Rul. 85–39, *supra*.

[18] In a revenue ruling the Commissioner reasoned that a tax rebate, applied in the form of a State income tax credit, was not income because it was "merely a means of effecting a statutory decrease in the tax liability" of those taxpayers. Rev. Rul. 79–315, 1979–2 C.B. at 27.

[19] The Commissioner's longstanding administrative position has been that the receipt and use of a State tax credit is not income. Rev. Rul. 79–315, *supra*; Rev. Rul. 70–86, *supra*; Chief Counsel Advice 200842002 (Oct. 17, 2008). The general exception is that a refund of a tax claimed as a Federal income tax deduction in a prior year is income. Sec. 111.

Respondent does not assert, and there is no evidence, that petitioners sold credits that they could have claimed against a State income tax liability. Therefore, whether a taxpayer who sells credits at a discount that he could have used, pays his State tax liability, and deducts that liability for Federal tax purposes may receive capital gains treatment on the sale of those credits is not at issue here.

earned income or to earn income. Consequently, the sale proceeds are not a substitute for rights to ordinary income. [20]

### 3. *Conclusion*

The State tax credits petitioners sold do not represent a right to income; therefore, the substitute for ordinary income doctrine is inapplicable. None of the categories of property in section 1221 that Congress specifically excepted from the term "capital asset" is applicable to the State tax credits. Accordingly, we hold the State tax credits petitioners sold are capital assets.

### C. *Basis*

Section 1012 sets forth the foundational principle that the basis of property for tax purposes shall be the cost of the property. Cost, in turn, is defined by regulation as the amount paid for the property in cash or other property. Sec. 1.1012–1(a), Income Tax Regs.

Petitioners argue that they have a cost basis in their State tax credits. On their tax return they claimed a cost basis in the credits based upon an allocation of $11,574.74 of professional fees they incurred in connection with establishing and donating the conservation easement. [21] In their cross-motion for partial summary judgment petitioners appear also to argue some portion of their basis in their land should be allocable to the State tax credits. [22] We find neither position tenable.

The first position assumes the expenses petitioners incurred to donate the conservation easement are properly allocable in their entirety to petitioners' State tax credits. However, individual taxpayers may deduct ordinary and necessary expenses incurred "in connection with the determination, collection, or refund of any tax" as an itemized deduction. Secs. 211 and 212. Appraisal fees and other ordinary and necessary expenses to determine a taxpayer's tax liability as the result of a charitable contribution may be

---

[20] Respondent's reliance upon the *Gladden* factors is misplaced. We previously determined the State tax credits do not represent contractual rights. We have also determined these credits do not represent a right to income. Therefore, it is inappropriate to apply the *Gladden* factors to the State tax credits.

[21] The fees consisted of accounting, appraisal, surveying, and other professional services.

[22] While petitioners did not raise their position in their pleadings, raising it in their motion has not prejudiced respondent.

deductible under section 212(3). See *Neely v. Commissioner*, 85 T.C. 934, 950–951 (1985); *Robson v. Commissioner*, T.C. Memo. 1997–176, affd. without published opinion 172 F.3d 876 (9th Cir. 1999); *Biagiotti v. Commissioner*, T.C. Memo. 1986–460. Expenses incurred to determine any State tax, including State income tax credits, are also expenses that may fall within the ambit of section 212(3). Sec. 1.212–1(l), Income Tax Regs.

Section 212 aside, petitioners' argument also glosses over section 1012. Under section 1012, cost basis generally is what a taxpayer paid to acquire an asset. See *Solitron Devices, Inc. v. Commissioner*, 80 T.C. 1, 16–17 (1983), affd. without published opinion 744 F.2d 95 (11th Cir. 1984). Petitioners paid transaction fees to establish a conservation easement that they donated to an unrelated third party. Petitioners did not acquire the State tax credits by purchase.[23] It was the State's unilateral decision to grant petitioners the State tax credits as a consequence of their compliance with certain State statutes. Accordingly, petitioners easement costs are not allocable as cost basis to their State tax credits.

Petitioners appear to take a second position in their motion without fully articulating that position. Petitioners cite *Fasken v. Commissioner*, 71 T.C. 650 (1979), for the proposition that where a taxpayer sells a portion of property any gain or loss is calculated separately for each part sold and the adjusted basis of the entire property is allocated to the portion sold. In *Fasken* the Court decided whether the consideration the taxpayers received for easement grants should be applied against their basis in all their land or applied to the portion of the basis allocable to the acreage upon which the easements were granted. *Id.* at 655–660. Unlike the taxpayers in *Fasken*, petitioners did not sell an easement; they made a charitable contribution. Petitioners assert that the rationale of *Fasken* should apply to their State tax credits. They appear to contend, like the taxpayers in *Fasken*, that their State tax credits are a portion of their land and that the basis in their land is allocable to their credits.

---

[23] This Court also notes that it has previously declined to adopt the "unusual concept that cost basis can be allocated to property other than * * * property purchased." *Solitron Devices, Inc. v. Commissioner*, 80 T.C. 1, 17 (1988), affd. without published opinion 744 F.2d 95 (11th Cir. 1984).

Colorado's grant of State tax credits creates cognizable property rights in those credits for the recipients of those credits. Cf. *United States v. Griffin*, 324 F.3d 330, 353–355 (5th Cir. 2003); *Barrington Cove Ltd. Pship. v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 5 (1st Cir. 2001) (finding a developer did not have a cognizable property interest in Federal income tax credits for purposes of a substantive due process claim where the developer had no entitlement to credits and held only a "unilateral expectation" and desire for the credits). Upon petitioners' receipt of the credits, their expectation matured and they then possessed ownership rights in their State tax credits. However, these credits are not a right petitioners possessed in their land. Instead, their rights in the credits, although achieved because of the property, arose on account of the grant from the State. Unlike the easement granted in *Fasken v. Commissioner*, *supra*, the State tax credits are not a property right in land that would necessitate the allocation of basis in the land to the credits. Therefore, *Fasken* does not control the tax treatment of petitioners' charitable contribution.

Moreover, there are rules for determining a donor's basis in the context of a conservation easement. The donor's entire basis in the property is allocated to the conservation easement according to the ratio that the fair market value of the easement bears to the total pre-easement fair market value of the property. Sec. 170(e)(2); *Hughes v. Commissioner*, T.C. Memo. 2009–94; sec. 1.170A–14(h)(3)(iii), Income Tax Regs. The donor reduces its basis in the retained property by the amount of basis allocated to the conservation easement. Sec. 170(e)(2); *Hughes v. Commissioner*, *supra*; sec. 1.170A–14(h)(3)(iii), Income Tax Regs. These rules do not permit an allocation based upon the value of a State tax credit, only on the value of the easement. Therefore, it would be inconsistent with these rules to allocate the donor's land basis to the value of a State tax credit.

There is nothing in the Code or the Commissioner's regulations that justifies allocating petitioners' basis in their land to the State tax credits. Therefore, we conclude petitioners do not have any basis in their State tax credits.

D. *Holding Period*

On their tax return petitioners reported a short-term capital gain from the sale of their State tax credits. In their cross-motion for partial summary judgment petitioners claim the sale of their State tax credits resulted in long-term capital gain.[24] The sale of capital assets held for more than 1 year will result in long-term capital gain or loss. Sec. 1222. Petitioners assert that they held the land upon which they donated the charitable conservation easement for more than 1 year and that their holding period in the land is attributable to their holding period in the State tax credits.

Assuming, without deciding, that petitioners have a holding period in their land that was greater than 1 year, their argument still fails. Petitioners' reasoning, citing *Fasken v. Commissioner*, *supra*, appears to be that their holding period in their land and State tax credits are one and the same because they are both part of the bundle of their real property rights.

As we explained *supra* p. 354, a Colorado taxpayer had no property rights in a conservation easement contribution State tax credit until the donation was complete and the credits were granted. The credits never were, nor did they become, part of petitioners' real property rights.

Instead, petitioners' holding period in their credits began at the time the credits were granted and ended when petitioners sold them. Since petitioners sold their State tax credits in the same month in which they received them, the capital gains from the sale of the credits are short term.

E. *Conclusion*

The State tax credits that petitioners sold are capital assets. Petitioners have no basis in their State tax credits. Additionally, petitioners held their credits for less than 1 year; therefore, the gains arising from their disposition are short-term capital gains.

---

[24] Respondent filed a response to petitioners' assertion. Therefore, petitioners' raising this issue in their motion has not prejudiced respondent.

To reflect the foregoing,

> *An appropriate order will be issued granting in part and denying in part respondent's motion for partial summary judgment and petitioners' cross-motion for partial summary judgment.*